KREMS et al., Appellants,

v.

UNIVERSITY HOSPITALS OF CLEVELAND et al., Appellees.

[Cite as *Krems v. Univ. Hosp. of Cleveland* (1999), 133 Ohio App.3d 6.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

Nos. 73854 and 73855.

Decided March 8, 1999.

*Nurenberg, Plevin, Heller & McCarthy Co., L.P.A., Jeffrey A. Leikin* and *Sandra J. Rosenthal,* for appellants.

*Davis & Young Co., L.P.A., Jan L. Roller; Baker & Hostetler, David L. Marburger, Lisa Hammond Johnson* and *Hilary W. Rule,* for appellees.

KARPINSKI, Judge.

Plaintiffs-appellants, Oscar and Amy Krems, appeal from the judgment of the trial court that granted summary judgment in favor of The Cleveland Plain Dealer ("PD") and University Hospitals of Cleveland ("UH"). Plaintiffs sought public donations to help with the medical bills for their terminally ill son. In two

**8**

separate articles, the PD criticized the couple for raising money when, in fact, a state program was paying the bills. Thereafter, plaintiffs brought a defamation action against the newspaper and the hospital. The trial court granted summary judgment for defendants. For the reasons that follow we find no merit to plaintiffs' arguments and affirm the judgment of the trial court.

This case begins with the tragic illness and death of plaintiffs' son, Zachary, who, at the age of eight months, was diagnosed with hepatoblastoma, a rare form of liver cancer. Zachary died of pneumoccocal meningitis almost a year later on January 1, 1996.

Because they did not have insurance, plaintiffs faced mounting medical bills during his illness. On the day of Zachary's diagnosis, plaintiffs met with Sheryl Cohen, the UH pediatric oncology social worker assigned to their case. She advised plaintiffs to apply to the Ohio Bureau of Children with Medical Handicaps ("BCMH"). In her deposition Amy Krems acknowledged that Sheryl Cohen advised her that once BCMH approval is obtained, "everything would be paid for." Cohen expressly explained to the Krems that BCMH is a state agency that provides financial coverage for specified periods of time. If BCMH coverage is approved, the health care provider bills BCMH directly and receives payment directly from BCMH. Once BCMH has paid the portion of the charge it approves, the health care provider may not bill the patient for the remainder.

The first approval letter was received on March 8, 1995. The letter stated that plaintiffs were covered from January 30, 1995 to April 30, 1995. At this point, as instructed by Cohen, plaintiffs sent the BCMH approval letter to all the health care providers that were sending them bills. A second approval letter, sent on July 26, 1995, extended coverage from January 30, 1995 to January 29, 1996.

On August 22, 1995, plaintiffs met with Marge Mordarski, a financial counselor with UH, and gave her all the bills they received that were not billed to BCMH. Mordarski reassured plaintiffs that BCMH would assume responsibility for all the bills. She also encouraged plaintiffs to apply for Medicaid because Oscar Krems had recently lost his job in late July 1995. By October or November 1995, Medicaid became the primary payor for all of plaintiffs' related medical expenses, retroactive to August 1.

During the summer of 1995, plaintiffs sought media help to raise money to help with their situation. In various flyers posted in public places, plaintiffs described their medical bills as "skyrocketing." On July 30, 1995, plaintiffs issued a press release to local television stations and numerous newspapers. The release stated:

"In addition, the Kremses' financial journey will continue on. Without a health insurance policy, doctors' fees, surgeries, hospital stays, chemotherapy and home treatment bills have put the family over $700,000.00 in debt. Fortunately, the

Bureau of Children with Medical Handicaps will cover many hospital bills for this uninsured child. However, the Bureau covers only 90 days of hospital stays. Zachary is currently at 80 days and has many more treatments to go."

The release went on to ask the public to send donations to a fund established at the plaintiffs' church to aid with their "growing debt." Additionally, plaintiffs distributed in public places leaflets which stated that the family had accrued over $700,000 in bills.

In response to the press release, two local TV stations, WKYC, Channel 3, and WJW, Channel 8, interviewed plaintiffs about their situation in August 1995. During the WJW interview, Oscar Krems estimated that the medical bills were well over $700,000 already and only part of their total medical bills were going to be covered. As a result of the press releases and publicity, plaintiffs received over $3,000 in donations.

After the story, WJW's reporter faxed a copy of the press release to UH's Media Relations Coordinator, Janice Guhl. Guhl then met with UH's Government Affairs Director, Bernard Weems, and Modarski. They determined that plaintiffs did not owe the hospital anything and that plaintiffs were not in debt $700,000 for Zachary's care.

On August 22, 1995, Modarski then met with plaintiffs. She examined the bills that they had received and told them to direct the bills to BCMH. The outstanding bills for Zachary's care as of August 1995 totaled $80,119.42. Modarski assured plaintiffs that their balance would be zero because they would not be responsible for any of this amount.

Thereafter, PD writers Laura Yee and Joan Mazzolini wrote an article (see Appendix) published on August 27, 1995, which chronicled plaintiffs' financial situation and pleas for help. Prior to the story, the reporters interviewed hospital officials and plaintiffs. The headline for this story stated, "Hospital says no money owed" and "Family appealed to public for help." (The complete article is reproduced as an appendix to this opinion.) Moreover, on September 1, 1995, the editorial staff criticized the family in the weekly "Cheers & Jeers" column:

"JEERS ... to Oscar and Amy Krems of Lakewood, who tugged at the community's heartstrings with their appeals for money—700,000 they said—on behalf of their cancer-stricken baby. But Rainbow Babies and Childrens Hospital officials said the Kremses have no bills because they are covered by the state's Bureau of Children with Medical Handicaps. Such misguided campaigns give people with legitimate appeals a bad name."

After this column was published, ABC World News Tonight interviewed plaintiffs.

Plaintiffs filed suits against UH, Rainbow Babies and Children's Hospital,[1] and the PD. The cases were eventually consolidated and both defendants moved for summary judgment. In a comprehensive opinion, the trial court held, *inter alia*, as follows: (1) the facts reported from the hospital to the PD were literally correct and contextually neutral, (2) the August 27, 1995 article contained no misstatements of fact, and (3) the "Cheers and Jeers" column was a non-actionable expression of fact. Plaintiffs timely appeal, raising one assignment of error:

"The trial court erred in granting defendants' motions for summary judgment when the evidence supported each element of plaintiffs' libel claims."

In this assignment, plaintiffs argue that they presented substantial evidence to support their libel claims against the defendants. Specifically, on appeal, plaintiffs argue that defendants committed libel by:

"(1) implying the Kremses sought to sucker the public into donating money to a fund that was undertaken for their own personal benefit; (2) stating falsely the family owned [*sic*] no medical costs when in fact such costs were owed; (3) stating falsely that it had been explained to the family 'at the beginning and all through the process of Zachary's hospital stay' that '[t]he cost of doctor and hospital procedures to the patient is zero'; and (4) stating falsely that the Kremses had been assigned a billing counselor 'at the beginning of Zachary's treatment.'"

After reviewing the articles and the evidentiary materials submitted, we find no merit to plaintiffs' arguments.

Under Ohio law, libel is defined as, "a false and malicious publication made with the intent to injure a person's reputation or expose him to public hatred, contempt, ridicule, shame or disgrace, or affect him adversely in his trade or profession." *Thomas H. Maloney & Sons, Inc. v. E.W. Scripps Co.* (1974), 43 Ohio App.2d 105, 72 O.O.2d 313, 334 N.E.2d 494. The elements of a libel action are falsity, defamation, publication, injury, and fault. *Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789. See also, *Natl. Medic Serv. Corp. v. E.W. Scripps Co.* (1989), 61 Ohio App.3d 752, 573 N.E.2d 1148, in which the court stated:

"[F]alsity is an essential element to a libel action; therefore, a true statement cannot provide the basis for such an action. *Driscoll v. Block* (1965), 3 Ohio App.2d 351, 32 O.O.2d 506, 210 N.E.2d 899. As Professor Prosser stated: 'It is

---

**1.** Rainbow Babies and Children's Hospital is a part of University Hospitals of Cleveland and, for all purposes herein, they are the same legal entity. They are collectively referred to herein as "UH."

sufficient [in defending against a defamation action] to show that the imputation is substantially true, or as it is often put, to justify the "gist," the "sting," or the substantial truth of the defamation.' Prosser, Law of Torts (4 Ed.1971) 798–799; accord *Cooper School of Art v. Plain Dealer Publishing Co.* (May 8, 1986), Cuyahoga App. No. 50569, unreported, 1986 WL 5294. Thus, appellants' assertion that the challenged statements were defamatory fails when they failed to establish a prima facie case on the element of falsity, *i.e.*, when the record reveals that the published reports were fairly accurate or substantially true." *Id.* at 755, 573 N.E.2d at 1150.

In the case at bar, plaintiffs have not established the material falsity of any statements made by the PD or UH. Plaintiffs argue it was false to report that plaintiffs had no medical and hospital costs when they did have outstanding bills at the time of the article—August 27, 1995. Paragraph four of the article states:

"But officials of Rainbow Babies and Children's Hospital say the Kremses owe no money for Zachary's medical care. The officials say the medical and hospital costs have come to less than $100,000—not the $700,000 the Kremses say they owe. In fact, the hospital and doctors will be reimbursed for Zachary's medical care by Ohio's Bureau of Children with Medical Handicaps."

This statement was true because plaintiffs had applied and received BCMH coverage first in March and again in July 1995. This coverage was extended throughout 1995. Thus, they were not responsible for any outstanding bills in this matter. The remainder of paragraph four is also true because at the time the article was published the outstanding charges were approximately $80,000, not the $700,000 the plaintiffs claimed, and it is clear that BCMH had already granted coverage for the earlier bills submitted. Moreover, plaintiffs were properly advised that BCMH could be expected to extend the coverage for the remainder of the child's care.[2] Therefore, paragraph four of the article is not libelous.

Plaintiffs also contest paragraph five, which states:

"The cost of doctor and hospital procedures to the patient 'is zero,' said Janice Guhl, a spokeswoman for Rainbow. 'All of this has been explained to this family from the beginning and all through the process of Zachary's hospital stay.'"

This statement is true. Plaintiffs admit that Cohen and Modarski told them that their bills would be covered.

Plaintiffs also contest the truth of paragraph twelve, which states:

---

2. In fact, BCMH sent an approval letter four days before plaintiffs issued their news release.

"Because the Kremses had no insurance, Rainbow assigned them a billing counselor at the beginning of Zachary's treatment."

This statement also is true. On February 2, 1995, plaintiffs met with Sheryl Cohen, who advised the family about coverage of Zachary's expected medical bills. Cohen explained the BCMH coverage that plaintiffs later obtained. As a social worker, she counseled plaintiffs about the bills and thus could properly be described as a "billing counselor."

■ Because the truth is an absolute defense to a defamation action, summary judgment was properly granted for defendants. In his well-written opinion granting summary judgment, Judge Curran noted as follows:

"This court is unable to discern any material misstatements of fact much less any inferentially false or defamatory references in the newspaper account; nor is there an expression of opinion which could be stretched into libel.

"In defending against the pending motion practice, plaintiffs' [*sic* ] contend that hindsight is of 'no moment' because the newspaper account though evidently prophetically true was false when published. This Court disagrees with that proposition, because it tends to relegate truth to mere metaphysical sophistry. And this Court knows of no case standing for the proposition that a predicted portrayal as such and which [*sic* ] is known at the time of litigation to be accurate in the cold light of existing hindsight, should be actionable, even if recklessly laid out. But the totality of the circumstances surrounding the story fails to reveal any journalistic predictions. What it does reveal is a failure of disclosure—an essential failure—not by the press but by the Krems [*sic, Kremses*]."

■ In addition, plaintiffs argue that defendants committed libel by "implying" that plaintiffs sought to "sucker" the public into contributing. This argument fails. Ohio does not recognize libel through implied statements. *Ashcroft v. Mt. Sinai Med. Ctr.* (1990), 68 Ohio App.3d 359, 588 N.E.2d 280. Moreover, the article went out of its way to state that the hospital did not believe that the plaintiffs had a fraudulent purpose:

"Rainbow officials have not accused the Plaintiffs of raising money for personal use, though they are concerned that the family is misrepresenting the hospital in their plea for help. The hospital officials believe the parents might be overwhelmed by Zachary's illness and the cost of his care."

■ First, Ohio employs the "innocent construction" rule, which requires that contested statements be given their nonactionable interpretation. *Yeager v. Local Union 20* (1983), 6 Ohio St.3d 369, 6 OBR 421, 453 N.E.2d 666. Here, moreover, the article merely reports what the hospital officials said. We decline,

therefore, to find any liability based on plaintiffs' argument that the article implied that plaintiffs intended to "sucker" the public.

 Plaintiffs finally argue that the PD's "Cheers and Jeers" column characterized them as thieves perpetrating a fraud upon the public. This column, however, was an expression of opinion and, therefore, not actionable as defamation. *Vail v. Plain Dealer Publishing Co.* (1995), 72 Ohio St.3d 279, 649 N.E.2d 182.

Accordingly, the trial court did not err in granting defendants' motions for summary judgment.

*Judgment affirmed.*

BLACKMON, A.J., and ROCCO, J., concur.

## APPENDIX

Laura Yee and Joan Mazzolini, *Hospital Says No Money Owed: Family Appealed to Public for Help,* CLEV. PLAIN DEALER, Aug. 27, 1995.

"Oscar and Amy Krems, whose infant son is fighting a rare liver cancer, look like victims of an inadequate health care system.

"The father worked full time, but the Lakewood family had no health insurance to cover what they said amounted to $700,000 in bills for operations, tests, chemotherapy and related procedures that 14–month–old Zachary has undergone in the last seven months.

"So the Kremses turned to the news media, aware that hard-luck stories can persuade the public to dig deep into its pockets and give. Nearly $3,500 has come in since two television stations broadcast their story earlier this month. A story on their case also appeared Thursday in a weekly newspaper.

"But officials of Rainbow Babies and Childrens Hospital say the Kremses owe no money for Zachary's medical care. The officials say the medical and hospital costs have come to less than $100,000—not the $700,000 the Kremses say they owe. In fact, the hospital and doctors will be reimbursed for Zachary's medical care by Ohio's Bureau of Children with Medical Handicaps.

"The cost of doctor and hospital procedures to the patient 'is zero,' said Janice Guhl, a spokeswoman for Rainbow. 'All of this has been explained to this family from the beginning and all through the process of Zachary's hospital stay.'

**"Three fund-raisers**

"Rainbow doctors and administrators say this is the third time in less than two months that families have conducted public fund-raisers for bills of a Rainbow patient when the bills actually were already covered.

"Rainbow officials have not accused the Kremses of raising money for personal use, though they are concerned that the family is misrepresenting the hospital in their plea for help. The hospital officials believe the parents might be overwhelmed by Zachary's illness and the cost of his care.

"But at the boy's hospital room Friday, Amy Krems, 27, said, 'We're really upset that they are telling you that the bills have been paid when they haven't been paid.'

" 'It's making it look like we're trying to rip people off, and we're not.'

"Rainbow officials say they are baffled by the Kremses' insistence that they have huge outstanding medical bills.

"In questionable situations, 'it can be an honest mistake, or people can be dishonest,' said Dr. Stuart Youngner, chairman of the ethics committee at University Hospitals of Cleveland, which oversees Rainbow. 'The only thing the hospital can do is tell the truth when lies or mistakes are made, and to make those records open to scrutiny.'

"Because the Kremses had no insurance, Rainbow assigned them a billing counselor at the beginning of Zachary's treatment.

"The family applied and qualified for help from the Bureau of Children with Medical Handicaps, a state and federal program that helps families pay their children's medical bills. The bureau, which is under the authority of the Ohio Department of Health, often pays for medical care for children in families who make too much to qualify for Medicaid.

"Rainbow officials say the Kremses have been asked to pay only for nonmedical incidentals, such as a $44.37 telephone bill, which are not covered by the bureau.

"It has been explained to the family, Guhl said, that bills are commonly sent to families automatically while doctors and hospitals wait for insurance or state reimbursement, but that the families don't have to pay them if they are covered.

**"Family fears bills**

"Amy Krems acknowledges that a Rainbow billing counselor told her last week that her bills were covered and took possession of the bills the family has received from doctors. Still, Krems said she fears the family might be held responsible for them.

"The hospital said it has sent statements, not bills, showing the amount owed by the bureau for their son's care.

"The family insists that no one has ever been clear that all the bills are covered and will continue to be paid.

" 'We don't know how much we have to pay,' said Oscar Krems, 29, as he kissed and bounced Zachary on his lap.

"His wife added, 'Until I see a zero balance, I don't believe it. I would not go public unless we had to.'

"But hospital officials say they have told the Kremses that as long as they cooperate and continue to apply for state assistance, the bills will be covered.

"Because Oscar Krems was laid off late last month, hospital officials believe that the family will become eligible for Medicaid.

"Amy Krems said the high cost of Zachary's care exacerbates her fear of not being able to pay other bills. Oscar Krems' weekly $295 unemployment check is barely enough to cover rent and utilities. They say they owe $24,000 on their credit cards, which have been charged to their limits.

"Once Zachary's treatment at Rainbow is completed, his mother said, she plans to take him to the Preventative Medicine Group, a group of doctors who practice alternative nutritional medicine in Westlake. There is a fee of $700 to begin treatment, which would not be covered by the state bureau, she said.

"Zachary, whose cancer is in remission, was at Rainbow this week for his sixth of eight cycles of chemotherapy. The baby has been in and out of the hospital since his cancer, hepatoblastoma, was diagnosed late January. Doctors successfully shrunk his tumor and were able to remove most of it. But there have been complications since the operation.

" 'I'm optimistic that he can be cured,' said Eric Kodish, Zachary's doctor. 'He's not at death's doorstep by any means, but I don't have a crystal ball.'

"If the chemotherapy is not enough, Zachary will need radiation therapy, Kodish said.

"Krems said she is worried that their current hospital stay will use the last 10 days of the 90 days of inpatient coverage allotted by the bureau. She said she will apply for additional days.

" 'The most we usually give is 90 days [in one calendar year], but we look at it on an individual basis,' said Dr. James Bryant, chief of the bureau. 'In cases that run over 90 days . . . the bureau makes exceptions.'

**"Coverage at risk**

"Bryant cautioned that because the bureau is the 'payer of last resort,' families raising money could jeopardize their coverage. Last year, the bureau helped more than 35,000 Ohio children, paying more than $22 million for medical care.

"Imploring the public for money to pay medical bills has become commonplace, and some medical ethicists say it is a sign of an ailing health system.

"Vicki and Jay Berger of Mansfield turned to the community earlier this summer to raise $500,000 for their two sons' bone marrow transplants. They had insurance, but it would pay only $50,000 for the procedures. The family raised $1.6 million.

"But relying on the charity of others poses problems. The less fortunate, who aren't as adept at fund raising, can face bankruptcy or a lifetime of bills. In the most tragic cases, people die before raising enough for an organ transplant or other procedure.

"And goodwill can be exploited. The most publicized case of misuse of money earmarked for medical bills occurred two years ago in Illinois, in the separation of Siamese twins who were joined at the chest and shared a heart. Their father admitted taking $8,000 for cocaine and other personal uses from public gifts meant for his daughters' care, according to wire service reports.

" 'You're talking about a lot of money,' said Ed Beer, uncle of the Berger boys and director of the fund-raising effort. 'I could see where it would be very easy to get caught up in that.'

"Last month, one family in Lorain County went public, saying they needed $200,000 to pay for their child's surgery, even though private insurance had covered most of the bill, which totaled $60,000, according to Rainbow officials. The fund-raising effort ceased after the child's doctor contacted the family about the discrepancy.

**"No controls by banks**

"Officials at area banks say that there are procedures for establishing charity accounts.

"Tom Ross, executive vice president of Mechanics Savings Bank in Mansfield, said money 'flowed here in bucketfuls' for the Berger boys.

" 'But we don't have any control over it,' Ross said.

"The state attorney general's office said the issue falls into a gray area.

" 'We're concerned about the charitable dollars going to where they're intended to go,' said Susan Miser, public information officer at the attorney general's office. She said state law requires people to register with the charitable foundation section of the office.

" 'But it's not our office's intention to go after sick people and make them register,' she said. 'If we receive complaints that people are giving money and

the payments are going to fly to Las Vegas to gamble, we have investigators that will look into that.'

"After the Kremses went public with their plea for money, Rainbow doctors and administrators took the issue to their ethics committee. They decided to establish a temporary committee to determine the role the hospital should play in families' fund-raising efforts. But Younger said the responsibility for ensuring that families are truly in need lies with the news media.

"Ed Beer, uncle of the boys who need bone marrow transplants, said the media asked the right questions when it came to his family.

" 'The media began to ask legitimate questions after we reached our mark [of $500,000],' Beer said. 'They began asking, "Now what are you going to do with the rest of the money?" '

"What they did was set up a trust fund with nonfamily members as directors to oversee the money. Once the boys' medical bills are all paid, excess money will go to other Ohio children with the same genetic disease, adrenoleukodystrophy, or ALD, Beers said.

**"Church has accounts**

"When the couple decided to ask the public for help, they approached Faith Lutheran Church in Lakewood. The church was already involved in raising funds for another local child, 9–year–old Katie Slater, who needs a third liver transplant.

"Funds raised for Katie are deposited in the church account, and the church then writes checks to the hospital or other health-care provider for Katie, not to the Slaters, said the Rev. Richard Schluep, the church's pastor.

" 'We wanted to ensure the [sic] that the money goes for what people intended,' he said.

"In the Krems case, however, the family told the church that while most of their medical bills were being paid by the state agency, they had a lot of other medical-related expenses, Schluep said. So the church did not set up the fund to write the checks. The pastor said on Thursday that the $3,500 in public contributions had not yet been given to the family and that he planned to discuss the control of the funds with them.

" 'They said they had some expensive formula they had to buy that cost $200 or $300 a month,' Schluep said. The family is buying the supplemental drink Pedialyte, which sells for about $3 a bottle.

"The Kremses are comforted by the public's response. Besides the money, good wishes have been sent to the family. One elderly woman did a nine-hour novena for Zachary, Amy Krems said.

" 'There are so many good people,' she said. 'I just can't believe how caring the world can be.'

"Once Zachary is well, the Kremses said, they want to help others.

" 'We really want good things to come out of this. We realize what is important ... family and friends,' Amy Krems said. 'Our goal is to have a farm, raise crops, give to orphanages. We want to help people.' "