JOURNAL ENTRY AND OPINION
{¶ 1} Plaintiff Donna Stohlmann (appellant) appeals the court granting summary judgment to defendants New World Communications of Ohio, Inc., d.b.a. WJW Television and Fox Broadcasting (WJW), in her defamation claim. After reviewing the facts of the case and pertinent law, we affirm.
 I. {¶ 2} On February 23, 1998, five-month-old Madelyne Hall (Hall) died while under appellant's care at appellant's home-based daycare. The cause of Hall's death remains unexplained. Stemming from this unfortunate event, two things that became the basis of this lawsuit happened: 1.) appellant was indicted with multiple counts of child endangerment, tampering with evidence and falsification; and 2.) appellant became the subject of various news stories throughout Northeast Ohio.
 {¶ 3} On January 6, 2000, appellant pled guilty to two counts of child endangerment, two counts of falsification and one count of tampering with evidence, and on February 8, 2000, the court sentenced appellant to five years probation. One of the victims of the child endangerment was Hall. Additionally, the falsification charges were based on false statements appellant made to the authorities concerning the investigation of Hall's death, and the tampering with evidence charge was based on appellant and her husband moving Hall's crib before the police arrived at the scene. Throughout the criminal proceedings, the court, as well as the State of Ohio, made it clear that appellant was not charged with, and thus was not being tried for, causing Hall's death. Rather, pursuant to R.C. 2919.22, appellant pled guilty to endangering children, which is defined as creating "a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support." During appellant's plea hearing, the prosecutor stated the following: "[T]his particular indictment specifically and only addresses failure to provide a duty of care to the child, Madelyne Hall, relative to the lack of a monitor, supervision, et cetera. There is no nexus to the death of Madelyne Hall in [Case No.] 379679." Furthermore, during appellant's sentencing hearing, the court stated the following: "In fact, I don't think the trial of this case would have actually, on the charges the State of Ohio brought, would not have dealt with the death of Madelyne Hall. * * * We don't have charges about anyone causing the death of Madelyne Hall."
 {¶ 4} WJW broadcasted three news segments in relation to appellant's criminal case which appellant alleges defamed her. The dates of the three broadcasts are: January 6, 2000 (the day appellant pled guilty); February 8, 2000 (the day appellant was sentenced); and February 9, 2000. According to the record, portions of the broadcasts pertinent to appellant's claim of defamation are as follows:[1]
 January 6, 2000
 Anchor: "A 5-month old child dies in her home and now for the first time her babysitter admitted her role in the infant's death.[2] The I-Team's Carl Monday, who first broke this story, reports on the guilty plea of Donna Stohlmann."
 Monday: "Donna Stohlmann was escorted down a back hallway of the Justice Center. A futile attempt to shield her from I-Team cameras. Earlier, Judge Janet Burnside refused to allow our cameras in the courtroom, saying publicity at Stohlmann's sentencing would be enough. Inside the courtroom, Stohlmann, as part of a deal with the county prosecutor, pleaded guilty to two counts of child endangering, two counts of falsification and one count of tampering with evidence. The tampering charge and the falsification charges and one of the endangering counts concerned the death of then 5-month old Madelyne Hall found suffocated in a port-a-crib at Stohlmanns' Lyndhurst home."
 * * *
 Monday: "Investigators have said Madelyne may have been dead for an hour before her lifeless body was discovered. Her father's hoping Stohlmann gets the maximum when she's sentenced next month."
 Mr. Hall: "I know the evidence that you may never see, but someday I'm sure I'll be able to reveal to you, it boggles the mind, and any parent out there it would make the blood boil the things that I know and they would wonder how I stood, stood up in front of you today and they would wonder how my wife even walks around. The things that we do know went on that day."
 Monday: "Stohlmann's husband also pleaded guilty to obstruction of justice for falsifying information he gave to Lyndhurst police. Donna Stohlmann also pleaded guilty to an additional charge of child endangering involving the son of Cindy and Larry Allen, who were in the courtroom today. Prosecutors say Stohlmann failed to respond when their son suffered a potentially dangerous allergic reaction. Prosecutors say Stohlmann also stuffed a rag in the mouths of two other children to stop them from crying and in the early 90's a boy died in the home after choking on his own vomit. Neither of the incidents were related to today's guilty plea. Investigators say Stohlmann also lied to the State about the number of children she was watching in her home."
 * * *
 Monday: "About the time the Stohlmanns will be sentenced, a State subcommittee will decide if changes in Ohio daycare law are necessary. If the law isn't strengthened, Lawrence Hall says his daughter Madelyne will have died in vain."
 Mr. Hall: "If some of the enforcement laws and administrative laws are not changed it will be just as tragic to me if that's not done."
 February 8,2000
 Co-anchor: "Good evening everyone. A Lyndhurst family is asking why tonight. Why did their former babysitter not go to jail in connection with the death of their 5-month old baby?"
 Co-anchor: "The I-Team's Carl Monday, who broke this story 2 years ago now was in the courtroom today for the emotional conclusion."
 Monday: "The father of Madelyne Hall weeps openly in a packed Justice Center courtroom as a judge passes sentence on the family's babysitter, Donna Stohlmann. Nearly two years ago to the day, Lawrence and Jennifer Hall dropped off their 5-month old daughter at the Stohlmann's Lyndhurst home. It was the last time they saw her alive."
 Mr. Hall: "Donna neglected children. She did not feed our daughter the entire day, you know how unconscionable that is. She did not change her diaper. She put her down somewhere, hungry, for the rest of the day. Then checked back on her about 2:30 to find her dead."
 * * *
 Mr. Hall: "The only person that chose not to put Donna and Cliff Stohlmann in jail is Judge Janet Burnside, the person who does not protect children, who does not send a message to people who are taking advantage of children. That's the only person who changed this decision. She asked for a pre-sentence report and it came back recommending jail time."
 * * *
 Monday: "For the first time, Stohlmann talked publicly about the case. Apologizing to the court for impeding the investigation into Madelyne's death. During the probe, she told Lyndhurst police the infant suffocated, her head trapped under the mattress of her port-a-crib. The coroner ruled the death undetermined. The man who headed the investigation has his own ideas."
 Lt. Uzell: "I think they should have gotten jail time, ah, unfortunately, like the judge pointed out they weren't charged with murder and ah, because of that, I think they got away with murder. I feel the baby died, ah, and it was due to circumstances that weren't natural and due to a cover up. We'll never know the truth."
 Mrs. Allen: "Damn — you're gonna go to hell!"
 Monday: "Today's sentence left parents frustrated and outraged."
 Mrs. Hall: "I gave her my daughter to watch, I paid her to watch my child. She gave me a dead baby. She did not fulfill her duty of care."
 Monday: "Is there anything you want to say to Donna Stohlmann at this point?"
 Mr. Hall:"Feel lucky that you're living in your own house. Feel lucky that you drew Judge Burnside today. And feel lucky that you were able to fool a lot of people. But you don't fool me, you don't fool the people of Northeastern Ohio. They know you're guilty and the ultimate Judge will be seeing you some day later and they will not let you in, because Madelyne will be standing at the gates and she will not let you in."
 February 9, 2006
 Co-anchor: "Good evening everyone. Thank you for joining us tonight. Some say a Lyndhurst babysitter, and I quote here, `Got away with murder.' But tonight, the judge who sentenced her to probation instead of prison is defending her decision."
 Co-anchor: "The I-Team's Carl Monday has more now on the death of a baby girl in reaction to the controversial sentencing of the woman who was supposed to be watching her."
 Monday: "Babysitter Donna Stohlmann dodged jail time for impeding the police probe into the death of a child under her care. But today the prosecutor says Stohlmann got off easy."
 * * *
 Monday: "What you are seeing, for the first time, are actual pictures taken inside a second floor bedroom of the Lyndhurst home of Donna and Clifford Stohlmann. It was in the room, inside this port-a-crib, that 5-month old Madelyne Hall was said to have suffocated back in February of 1998. But by the time Lyndhurst detectives arrived on the scene, the crib had already been moved, a major piece of evidence had been tampered with."
 * * *
 Monday: "As angry as the Halls are, they're prepared to put the Judge's decision behind them and lobby for stiffer laws that will prevent yet another child from dying under the care of their babysitter."
 {¶ 5} On December 29, 2003, appellant filed a defamation claim against WJW based on the above-referenced broadcasts, essentially alleging that WJW "recklessly, maliciously, or negligently made reports and published statements to the effect that the plaintiff had participated in the death of one Madelyne Hall." Appellant claims that while WJW accurately quoted various sources, "it is unquestionable that it chose to depict the plaintiff as criminally causing or contributing to the death of Madelyne Hall."
 {¶ 6} On May 9, 2005, the court granted summary judgment to WJW, and it is from this order that appellant appeals.
 II. {¶ 7} In her sole assignment of error, appellant argues that "the trial court erred when the court to the prejudice of the appellant entered a summary judgment in the defendant's favor."
 {¶ 8} Appellate review of granting summary judgment is de novo. Pursuant to Civ.R. 56(C), the party seeking summary judgment must prove that 1.) there is no genuine issue of material fact; 2.) they are entitled to judgment as a matter of law; and 3.) reasonable minds can come to but one conclusion and that conclusion is adverse to the non-moving party. Dresher v. Burt (1996), 75 Ohio St.3d 280.
Freedom of speech is a constitutionally protected state and federal right. Section 11, Article I, Ohio Constitution; the First Amendment to the United States Constitution. However, the media is not protected when it publishes defamatory statements. Defamation is a false publication that injures a person's reputation, and generally speaking, it can come in two forms: slander, which is spoken; and libel, which is written. See, Dale v. Ohio Civ. Serv. Emp. Assn. (1991), 57 Ohio St.3d 112;Becker v. Toulmin (1956), 165 Ohio St. 549. A defamation claim consists of five elements: 1.) a false statement; 2.) about the plaintiff; 3.) published to a third party; 4.) with the required degree of fault by the defendant publisher; and 5.) that was either defamatory per se, or defamatory per quod, causing special harm to the plaintiff. Davis v.Jacobs (1998), 126 Ohio App.3d 580.
 {¶ 9} Concerning element four, the publisher's required degree of fault required by a publisher varies depending on the status of the plaintiff, ranging from a private individual to a public figure.Gertz v. Welch, Inc. (1974), 418 U.S. 323. When a plaintiff is a private individual, he or she must prove that the defendant was negligent in publishing the defamatory statement to succeed in a libel claim.Dale, supra, 57 Ohio St.3d 112. When the plaintiff is a public figure, on the other hand, a successful defamation claim requires clear and convincing evidence that the statement was published with "actual malice." New York Times Co. v. Sullivan (1964), 376 U.S. 254, 280. In addition, courts have created a "limited purpose public figure," which is a plaintiff who becomes a public figure for a specific range of issues from which the person gains general notoriety in the community.Gertz, supra, at 351. A limited purpose public figure also has to prove that the libelous statement was made with actual malice. See Kassouf v.Cleveland Magazine City Magazines (2001), 142 Ohio App.3d 413.
 {¶ 10} In the instant case, both parties argue that appellant is a limited purpose public figure. However, we disagree. A plaintiff is not a limited purpose public figure in relation to alleged defamation arising from a crime that he or she committed. See Id. at 421.
 "[W]hile participants in some litigation may be legitimate `public figures,' either generally or for the limited purpose of that litigation, the majority [are] * * * drawn into a public forum largely against their will in order to attempt to obtain the only redress available to them or to defend themselves against actions brought by the State or by others. There appears little reason why these individuals should substantially forfeit that degree of protection which the law of defamation would otherwise afford them simply by virtue of their being drawn into a courtroom. The public interest in accurate reports of judicial proceedings is substantially protected by Cox Broadcasting Co. [v. Cohn (1975), 420 U.S. 469]. As to inaccurate and defamatory reports of facts, matters deserving no First Amendment protection, see 418 U.S., at 340, we think Gertz provides an adequate safeguard for the constitutionally protected interests of the press and affords it a tolerable margin for error by requiring some type of fault."
Time, Inc. v. Firestone (1976), 424 U.S. 448, 457. See, also,Wolston v. Reader's Digest Assn. (1979), 443 U.S. 157, 168 (rejecting the notion that "any person who engages in criminal conduct automatically becomes a public figure for purposes of comment on a limited range of issues relating to his conviction").
 {¶ 11} Taking Time, Inc. into consideration, we see no other facts in the record hinting that appellant takes on a public figure status for the purpose of her defamation claim. Accordingly, we rule that for the purpose of the instant action, appellant is a private individual who must prove that WJW acted negligently as to the fault element of her libel claim. Having established that the degree of fault required by WJW is negligence, we now turn to our analysis of the five elements of a defamation claim, starting with the first element of falsity.
 {¶ 12} "[A] statement on matters of public concern must be provable as false before there can be liability under state defamation law * * *."Milkovich v. Lorain Journal Co. (1990), 497 U.S. 1, 19.[3] While a plaintiff must prove falsity, a publisher may defend the allegedly defamatory statement by showing that "the imputation is substantially true, or as it is often put, to justify the `gist,' the `sting,' or the substantial truth of the defamation." National Medic Services Corp. v.E. W. Scripps Co. (1989), 61 Ohio App.3d 752, 755, quoting Prosser, Law of Torts (4 Ed. 1971) 798-99.
 {¶ 13} In the instant case, appellant argues that WJW depicted her as being criminally responsible for Hall's death, despite that she was not charged with murder, let alone found guilty of the act. In establishing this argument, appellant states the following in her brief: "Althoughthe defendant accurately quoted other prior defendant's [sic] it is unquestionable that it chose to depict the plaintiff as criminally causing or contributing to the death of Madelyn [sic] Hall"; and "the appellee has, through the use of accurate quotes and facts, given an inaccurate slant or `gist' to its articles that can only be considered as defamatory, i.e., the plaintiff's [sic] either intentionally or negligently caused the death of Madelyn [sic] Hall." (Emphasis added.) We agree with appellant; however, this argument works against her claim. Truth is an absolute defense to defamation. Krems v. University Hosps.of Cleveland (1999), 133 Ohio App.3d 6. Furthermore, "Ohio does not recognize libel through implied statements." Id. at 13 (citingAshcroft v. Mount Sinai Medical Center (1990), 68 Ohio App.3d 359).
 {¶ 14} We continue this portion of our analysis by identifying statements within the broadcasts in question that are true and eliminating them from further review.[4]
 January 6, 2000
 {¶ 15} "[Appellant] admitted her role in the infant's death." WJW's anchor made this statement on the same day that appellant pled guilty to child endangerment concerning Hall. Technically, a guilty plea is an admission. Furthermore, having a role in an event is not the same thing as causing an event. It is undisputed that appellant pled guilty to failing in her duty to care, protect or support Hall on the day she died. We feel that it is an accurate statement to say that appellant played a role in the events surrounding Hall's mysterious death.
 {¶ 16} "Prosecutors say Stohlmann also stuffed a rag in the mouths of two other children to stop them from crying," and "investigators say Stohlmann also lied to the State about the number of children she was watching in her home." From the record, we ascertain that these two statements are true. Appellant was charged with child endangerment in relation to putting rags into children's mouths; however, this charge was dropped as part of the plea agreement. Furthermore, Lieutenant Uzell of the Lyndhurst Police Department testified that appellant lied about the number of children she was watching in her home on the day Hall died.
February 8, 2006
 {¶ 17} "[I]n connection with the death of their 5-month old baby." As stated earlier, there is a connection between appellant's convictions and Hall's death, particularly in the tampering with evidence and falsification charges. WJW does not say anything about a causal connection; therefore, the statements are true.
 {¶ 18} "It was the last time they saw her alive." This statement is true and needs no further explanation.
 {¶ 19} "[Appellant] neglected children.* * *" Appellant was convicted of child endangerment, and a careful review of the record shows that appellant told authorities that Hall had not eaten while under her care on the day she died. From the evidence before us, this statement is true.
 {¶ 20} "[Appellant] told Lyndhurst police the infant suffocated, her head trapped under the mattress of her port-a-crib." Appellant's February 23, 1998 written statement to the police reads: "infant * * * was sideways — face down under mattress — was cold * * *." This, as well as appellant's deposition testimony, reveals that Monday's statement is a substantially accurate account of what appellant said.
February 9, 2006
 {¶ 21} Co-anchors' lead in. These are true statements reflecting the public's reaction to appellant's probation sentence. For example, Lieutenant Uzell is quoted as saying appellant got away with murder. And Lieutenant Uzell did, in fact, say those very words.
 {¶ 22} Monday's statement that appellant "dodged" jail time for "impeding" the investigation. This is substantially true, as appellant did face possible prison time for the charges to which she pled guilty, which included tampering with evidence before the investigation.
 {¶ 23} Monday's description of the room in which Hall died. From the record, these statements are factually accurate, thus, as a matter of law they are not defamatory.
 {¶ 24} "Prevent yet another child from dying under the care of their babysitter." Technically, Hall died while under appellant's care. Additionally, Mr. Hall's statement during WJW's January 6, 2000 broadcast concerns changing the laws related to home-based daycares.
 {¶ 25} In addition to true statements, an individual's opinions are also considered protected speech under the Ohio Constitution, and may not be the basis of defamation claims. See Wampler v. Higgins (2001),93 Ohio St.3d 111. In deciding whether a statement is opinion based, we look to "the type of language used, the meaning of the statement in context, whether the statement is verifiable, and the broader social circumstances in which the statement was made." Vail v. Plain DealerPublishing Co. (1995), 72 Ohio St.3d 279, 281 (quoting Milkovich v.Lorain Journal Co. (1990), 497 U.S. 1, 24 (Brennan, J., dissenting)).
 {¶ 26} The remaining excerpts from WJW's broadcasts can be analyzed using the elements of Vail's opinion-based test:
January 6, 2000
 {¶ 27} Mr. Hall's statement about unseen evidence. Phrases such as "boggles the mind" and "make the blood boil" clearly can be attributed to a grieving parent expressing his opinion about appellant's role in his daughter's death. Additionally, this is not the type of statement that is verifiable because it revolves around subjective emotions. For these reasons, we conclude it is Mr. Hall's opinion.
 {¶ 28} Mr. Hall's statement about it being "tragic" to him if daycare laws are not changed. What is tragic to one person may not be so to another; thus, it is one's opinion.
February 8, 2000
 {¶ 29} Mr. Hall's statement about the judge who sentenced appellant to probation. This statement reflects Mr. Hall's opinion that appellant's sentence was too lenient. In addition to being an opinion statement, the subject matter of Mr. Hall's remarks is a judge, rather than appellant.
 {¶ 30} Lieutenant Uzell's statement about appellant's role in Hall's death. Lieutenant Uzell begins this statement with the words "I think * * *." He repeats "I think" again, followed by "I feel" and ends the statement with "we'll never know the truth." This is a classic example of an opinion and does not amount to defamation as a matter of law.
 {¶ 31} Mrs. Allen and Mrs. Hall's statements that appellant did not fulfill her duty of care and is going to hell. These statements can be attributed to grieving parents expressing their opinions. Additionally, part of Mrs. Hall's statement is true in that appellant was paid to watch her daughter.
 {¶ 32} Mr. Hall's statement that appellant is lucky but that she is not fooling anyone. Another example of a grieving parent's emotional outburst and our final categorization of an opinion.
 {¶ 33} In summary, a defamation claim consists of five elements: 1.) a false statement; 2.) about the plaintiff; 3.) published to a third party; 4.) with the required degree of fault by the defendant publisher; and 5.) that was either defamatory per se, or defamatory per quod, causing special harm to the plaintiff. Davis, supra,126 Ohio App.3d 580. In the instant case, the only element that appellant can clearly prove is that the statements in question were published. Appellant failed to show that many of the statements were false; at least one statement was not about her; and the remaining statements were not defamatory in nature because they were people's opinions. Additionally, false innuendos emanating from accurate statements are not actionable under Ohio defamation law. Finally, we decline to address the issues of the degree of fault, if any, that WJW acted with, and the harm, if any, that appellant suffered, as this case can be decided without doing so.
 {¶ 34} Accordingly, we find the court did not err in granting summary judgment to WJW, and appellant's sole assignment of error is overruled.
Judgment affirmed.
It is ordered that appellees recover from appellant costs herein taxed.
It is ordered that a special mandate be sent to said court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
FRANK D. CELEBREZZE, JR., P.J., and JAMES J. SWEENEY, J., CONCUR
[1] Because a defamatory statement must be reviewed looking at the totality of the circumstances, or the entire context in which the statement was published, we are including excerpts of the broadcasts in question rather than isolated statements. See, e.g., Scott v.News-Herald (1984), 25 Ohio St.3d 243 (holding that in determining whether a statement is defamatory in nature, courts must look at the objective and subjective context of the allegedly defamatory remarks, as well as the broader context of the entire story). In addition, we have edited for grammar the transcript supplied by WJW.
[2] A careful reading of appellant's complaint and appellate brief leaves us unclear as to what specifically appellant alleges is defamatory. Is it the three broadcasts in toto? Is it one or more particular remarks? Because these inquiries are unanswered, we have attempted to identify the portions of the broadcasts that appellant considers defamatory; they are marked in bold italics.
[3] We note that the safety of children in home-based daycares is, by common sense, a matter of public concern.
[4] For the most part, this exhaustive, statement-by-statement analysis of the allegedly defamatory remarks follows the broadcast excerpts marked in bold italics.