[Cite as *Sullins v. Raycom Media, Inc.*, 2013-Ohio-3530.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### No. 99235

---

## LAVELLE SULLINS

### PLAINTIFF-APPELLANT

vs.

## RAYCOM MEDIA, INC., ET AL.

### DEFENDANTS-APPELLEES

---

## JUDGMENT:
## AFFIRMED IN PART; REVERSED IN PART; REMANDED

---

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-771804

**BEFORE:** Rocco, J., Boyle, P.J., and Blackmon, J.

**RELEASED AND JOURNALIZED:** August 15, 2013

**ATTORNEYS FOR APPELLANT**

Joshua R. Cohen
Peter G. Pattakos
Cohen, Rosenthal & Kramer
700 West St. Clair Avenue
The Hoyt Block Building - Suite 400
Cleveland, Ohio 44113

**ATTORNEYS FOR APPELLEES WUAB AND WOIO, L.L.C.**

Michael K. Farrell
Melissa A. Degaetano
Baker & Hostetler L.L.P.
PNC Center
1900 East 9th Street
Suite 3200
Cleveland, Ohio 44114

**ATTORNEYS FOR APPELLEE CUYAHOGA COUNTY CRIME STOPPERS**

George S. Crisci
Jonathan D. Decker
Zashin & Rich Co., L.P.A.
55 Public Square, 4th Floor
Cleveland, Ohio 44113

**ATTORNEY FOR APPELLEE PINPOINT MEDIA, INC.**

Daniel Thiel
75 Public Square
Suite 650
Cleveland, Ohio 44113

KENNETH A. ROCCO, J.:

**{¶1}** In this defamation action, plaintiff-appellant Lavelle Sullins appeals from the decision of the Cuyahoga County Court of Common Pleas granting summary judgment in favor of defendants-appellees Pinpoint Media, Inc. ("Pinpoint Media"), Cuyahoga County Crime Stoppers ("Crime Stoppers"),  and WUAB and WOIO, L.L.C. ("WOIO") (collectively, "appellees").  Appellees, respectively, are a production company that produced a local television crime show, *Warrant Unit*, an organization that offers rewards to the public for information regarding unsolved crimes, and two Cleveland television stations that broadcast the *Warrant Unit* television program.  Sullins alleged that appellees defamed him when they depicted him on the *Warrant Unit* television program as a fugitive for the crime of passing bad checks, when, in fact, he had satisfied his sentence five months earlier, after pleading guilty to one count of the offense.  Based on our review of the record, we find that genuine issues of material fact exist as to the viability of Sullins's defamation claim.  Accordingly, we reverse the trial court's entry of summary judgment on that claim.

**Factual and Procedural Background**

**{¶2}** Sullins was featured on episode 17 of the *Warrant Unit* television program in a segment of the program called "Fugitive File," which identifies "Cleveland's 25 Most Wanted Fugitives."  For approximately seven or eight seconds, Sullins's photograph was shown, along with his name, age, height, weight, and address above the charge,

"PASSING BAD CHECKS." Sullins's information and photograph were accompanied by the narrative, "Lavelle Sullins. Wanted for passing bad checks." A reward was offered for information leading to Sullins's arrest. The narrator cautioned viewers against trying to apprehend Sullins or the other fugitives featured on the program themselves, warning: "Do not attempt to apprehend these people. You leave that to the professionals." The episode featuring Sullins aired on March 27, 2010. The program averages 56,000 viewers a week.[1]

{¶3} Although a capias had been issued for Sullins's arrest on a charge of passing a bad check in March 2009, more than a year earlier, there is no dispute that Sullins was not, in fact, a "fugitive" for "passing bad checks" at the time the program aired. The capias issued in March 2009 related to charges filed against Sullins after he bounced a check for $1,536 in connection with his purchase of a used vehicle several years earlier. Four days after it was issued, the capias was recalled. On April 30, 2009, Sullins pled guilty to one count of passing a bad check. He was sentenced to one year of community control sanctions and required to make restitution. Sullins made full restitution, and his community control sanctions were terminated early. As of October 16, 2009, more than five months before episode 17 of the *Warrant Unit* program aired, Sullins was deemed to have satisfied his sentence.

---

[1]As it relates to the *Warrant Unit* program, Pinpoint Media has a "straight barter" arrangement with WOIO. WOIO gives Pinpoint Media certain commercial spots to sell during the *Warrant Unit* program and keeps the revenue received for selling those spots; in exchange, WOIO receives a finished program to air. Any reward money paid to viewers for information that leads to a suspect's arrest is paid by Crime Stoppers.

{¶4} The "Fugitive File" segment was prepared using information obtained from the Cuyahoga County Sheriff's Department. Erin Acklin, a dispatcher for the sheriff's department, was charged with running reports on valid warrants and providing information on suspects to Crime Stoppers for use on the *Warrant Unit* television program. Approximately once a month, Acklin would compile excerpts of approximately 70 files from the department's Incarceration Management and Cost Recovery System ("IMACS"). The IMACS system is a non-public system used by the sheriff's department, which contains information regarding outstanding warrants. Acklin testified that there were no specific parameters she followed in selecting suspect files for use on the *Warrant Unit* program, other than to avoid warrants for drug charges and probation violations — "they wanted fresh warrants" — and to ensure that the group of suspects was diverse, i.e., to avoid sending "a lot of black males," as requested by Pinpoint Media. At the time she pulled the files, Acklin verified whether a warrant was outstanding based on the information in the IMACS system. Acklin then compiled a package of information on each suspect, consisting of the jacket front from the file of each suspect, a photograph, and a "booking sheet" printed from the IMACS system from the time the suspect was last booked. Once she prepared a stack of files, she would contact Christopher Rech, president and executive producer of Pinpoint Media, and advise him that the files were available for pickup. Because the status of a warrant could change at any time, Acklin testified that she and her sergeant, Sergeant David Synkowski, told Pinpoint Media "all the time" to update the information after Acklin gave it to them

by "double checking" the status on the public docket for the Cuyahoga County Court of Common Pleas. Acklin did not know how long it took before the sheriff's department received notice that a warrant had been withdrawn.

{¶5} Approximately once a week, David Rutt, coordinator for Crime Stoppers, picked up the information Acklin had compiled for the fugitives to be featured on the *Warrant Unit* program. Rutt would then deliver this information, without reviewing it, to Pinpoint Media for use in preparing the "Fugitive File" segment. With respect to Sullins, appellees received three pages of documents from the sheriff's department. The documents included a chart printed from the IMACS system that listed Sullins's name, the "record type" — "warrant" — the warrant/order number, and a brief description of the charge for which the warrant had been issued, i.e., four counts of "passing bad checks." Appellees also received a copies of Sullins's mug shots and a printout of a "booking sheet" that contained Sullins's personal information and physical description. The "booking sheet" identified Sullins's "inmate status" as "convicted" and also indicated that "holds" that had been previously placed by three suburban communities had been "removed." Although the sheriff's department represented, based on its records, that there was an outstanding warrant for Sullins's arrest as of the time Acklin compiled Sullins's information for the *Warrant Unit* program, there was nothing in the documentation appellees received from the sheriff's department that indicated the status of the warrant or when it had been issued.

{¶6} Pinpoint Media claims to have received Sullins's information from the

sheriff's department "shortly before" the episode featuring Sullins aired on March 27, 2010; however, there is nothing in the record that indicates exactly when appellees received Sullins's information from the sheriff's department or how long after appellees received this information that Sullins was featured on the *Warrant Unit* program. Sullins claims that had appellees checked the Cuyahoga County public docket prior to airing the episode, as instructed by the sheriff's department, they would have discovered that the warrant for his arrest for passing a bad check had been withdrawn more than a year earlier. Sullins further claims that the inaccurate reporting of Sullins's "fugitive" status was not an aberration. Of the 27 "fugitives" featured on Episode 17 of the *Warrant Unit* program, he contends 11 were not, in fact, "fugitives" at the time the program aired.

{¶7} Although there was no outstanding warrant for Sullins's arrest for passing bad checks at the time episode 17 aired, at least five warrants for his arrest were outstanding at that time related to misdemeanor traffic offenses pending in the city of Cleveland. Appellees, however, were not aware of the existence of these other warrants at the time the program aired.

{¶8} After the program aired, Sullins filed suit against appellees, alleging that the broadcast was defamatory per se and depicted him in a false light.[2] He further claimed that, as a result of the broadcast, he lost his job and access to his children and that his

---

[2]Sullins originally filed suit against appellees and Raycom Media, Inc. ("Raycom Media"), WOIO's parent company, on November 15, 2010, asserting a defamation claim. On September 12, 2011, he voluntarily dismissed the case without prejudice. He refiled his complaint on December 20, 2011, adding a claim for false-light invasion of privacy. Sullins dismissed Raycom Media with prejudice on November 13, 2012.

reputation in the community was damaged.

{¶9} In August 2012, appellees filed separate motions for summary judgment in which they argued, among other grounds, that the statements made regarding Sullins during the *Warrant Unit* program — i.e., that he was a "fugitive" wanted on an outstanding warrant for "passing bad checks" and one of "Cleveland's 25 Most Wanted Fugitives" — were protected by Ohio's statutory fair report privilege and common-law qualified privilege, that Sullins could not establish that appellees acted with the requisite degree of fault, and that the substantial truth and incremental harm doctrines barred Sullins's claims. On November 27, 2012, the trial court granted appellees' motions for summary judgment. The trial court held that appellees' depiction of Sullins as "evading arrest on a present charge of passing bad checks" was "arguably libelous per se." However, because the information appellees published was the same, albeit inaccurate, information contained in the sheriff's department's IMACS system, the trial court held that appellees' statements were protected by Ohio's statutory fair report privilege, R.C. 2317.05. Finding no factual basis to upon which conclude that appellees acted with "actual malice" — as required to defeat the privilege — and concluding that Sullins could not establish essential elements of a false-light invasion of privacy claim, the trial court entered summary judgment in favor of appellees on both Sullins's defamation and false-light invasion of privacy claims.

{¶10} Sullins appeals the trial court's entry of summary judgment in favor of appellees on his defamation claim, raising as his sole assignment of error:

The trial court erred in granting summary judgment to the Defendants on Sullins's defamation claim.

**{¶11}** Sullins does not assign as error the trial court's entry of summary judgment on his false-light invasion of privacy claim. Accordingly, we affirm the trial court's entry of summary judgment on that claim. However, for the reasons set forth below, we find that genuine issues of material fact exist that preclude summary judgment on Sullins's defamation claim. We, therefore, reverse the trial court's grant of summary judgment in favor of appellees on Sullins's defamation claim.

**Standard of Review**

**{¶12}** An appeal of a trial court's summary judgment ruling is subject to a de novo standard of review. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). We accord no deference to the trial court's decision and independently review the record to determine whether summary judgment is appropriate. *Id.*

**{¶13}** Under Civ.R. 56, summary judgment is appropriate when (1) no genuine issue exists as to any material fact, (2) the party moving for summary judgment is entitled to judgment as a matter of law, and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can reach only one conclusion, which is adverse to the nonmoving party.

**{¶14}** The moving party carries an initial burden of setting forth specific facts that demonstrate his or her entitlement to summary judgment. *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293, 662 N.E.2d 264 (1996). If the moving party fails to meet this burden,

summary judgment is not appropriate; if the moving party meets this burden, summary judgment is appropriate only if the nonmoving party fails to establish the existence of a genuine issue of material fact. *Id.* at 293.

**Defamation**

**{¶15}** Defamation occurs when a publication contains a false statement "'made with some degree of fault, reflecting injuriously on a person's reputation, or exposing a person to public hatred, contempt, ridicule, shame or disgrace, or affecting a person adversely in his or her trade, business or profession.'" *Jackson v. Columbus*, 117 Ohio St.3d 328, 2008-Ohio-1041, 883 N.E.2d 1060, ¶ 9, quoting *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 73 Ohio St.3d 1, 7, 651 N.E.2d 1283 (1995). To establish a claim for defamation, a plaintiff must show: (1) a false statement of fact was made about the plaintiff, (2) the statement was defamatory, (3) the statement was published, (4) the plaintiff suffered injury as a proximate result of the publication, and (5) the defendant acted with the requisite degree of fault in publishing the statement. *Am. Chem. Soc. v. Leadscope, Inc.*, 133 Ohio St.3d 366, 389, 390, 2012-Ohio-4193, 978 N.E.2d 832, ¶ 77, citing *Pollock v. Rashid,* 117 Ohio App.3d 361, 368, 690 N.E.2d 903 (1st Dist.1996); *see also Lucas v. Perciak*, 8th Dist. Cuyahoga No. 96962, 2012-Ohio-88, ¶ 12, citing *Akron-Canton Waste Oil, Inc. v. Safety-Kleen Oil Servs., Inc.*, 81 Ohio App.3d 591, 601, 611 N.E.2d 955 (9th Dist.1992).

**{¶16}** In this case, there is no dispute that Sullins was not, in fact, a "fugitive" wanted on an outstanding warrant for "passing bad checks" — as represented on the

*Warrant Unit* program — at the time the program aired.   Nor is there any dispute that the false statement was published.

**{¶17}** With respect to the second element — whether the false depiction of Sullins was defamatory — courts distinguish between defamation per se and defamation per quod.   "'Defamation per se occurs when material is defamatory on its face; defamation per quod occurs when material is defamatory through interpretation or innuendo.'"   *N.E. Ohio Elite Gymnastics Training Ctr. Inc. v. Osborne*, 183 Ohio App.3d 104, 2009-Ohio-2612, 916 N.E.2d 484, ¶ 7, quoting *Gosden v. Louis*, 116 Ohio App.3d 195, 206-207, 687 N.E.2d 481 (9th Dist.1996).   A statement is defamatory per se, if, on its face, "it reflects upon a person's character in a manner that will cause [the person] to be ridiculed, hated, or held in contempt" or in a manner that "tends to injure" the person in his or her trade or occupation.   *Gosden* at 206-207; *Ratkosky v. CSX Transp., Inc.*, 8th Dist. Cuyahoga No. 92061, 2009-Ohio-5690, ¶ 46.   Unless a privilege applies, damages and fault are generally presumed to exist if a statement is defamatory per se.[3]   *See, e.g.,*

---

[3]With respect to the fourth element, where fault is not presumed, the degree of fault required to prevail on a defamation claim depends on the status of the person allegedly defamed, ranging from a private individual to a public  figure. *Kassouf v. Cleveland Magazine City Magazines*, 142 Ohio App.3d 413, 421, 755 N.E.2d 976 (11th Dist.2001).   When a plaintiff is a private individual, the court applies a negligence standard; when a plaintiff is a public figure or a limited purpose public figure, the plaintiff must prove that the publisher acted with actual malice in publishing the alleged defamatory statement.   *Id.* at 421-422; *Jackson*, 117 Ohio St.3d 328, 2008-Ohio-1041, 883 N.E.2d 1060, at   ¶ 10; *New York Times v. Sullivan*, 376 U.S. 254, 280, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

Appellees argued below that Sullins was a "limited purpose public figure." We disagree.   An individual who commits a crime does not generally become a limited purpose public figure "in relation to alleged defamation arising from a crime

*Lewandowski v. Penske Auto Group*, 8th Dist. Cuyahoga No. 94377, 2010-Ohio-6160, ¶ 25, citing *Wampler v. Higgins*, 93 Ohio St.3d 111, 127, 752 N.E.2d 962, fn.8.; *Lennon v. Cuyahoga Cty. Juvenile Court*, 8th Dist. Cuyahoga No. 86651, 2006-Ohio-2587, ¶ 25; *Miller v. Cent. Ohio Crime Stoppers, Inc.*, 10th Dist. Franklin No. 07AP-669, 2008-Ohio-1280, ¶ 12. If an alleged defamatory statement is unambiguous, whether it is defamatory per se is a question of law for the court to determine. *Gosden* at 207, citing *Becker v. Toulmin*, 165 Ohio St. 549, 555, 138 N.E.2d 391 (1956).

**{¶18}** A false written statement or television broadcast accusing a person of committing a crime is defamatory per se. *See, e.g., Gosden* at 207, citing *Akron-Canton Waste Oil*, 81 Ohio App.3d at 601, 611 N.E.2d 955, and *State v. Smily*, 37 Ohio St. 30,

---

that he or she committed." *Stohlmann v. WJW TV, Inc.*, 8th Dist. Cuyahoga No. 86491, 2006-Ohio-6408, ¶ 10, citing *Kassouf* at 421; *see also Wolston v. Reader's Digest Assn.*, 443 U.S. 157, 168, 99 S.Ct. 2701, 61 L.Ed. 2d 450 (1979) (rejecting the proposition that "any person who engages in criminal conduct automatically becomes a public figure for purposes of comment on a limited range of issues relating to his conviction"). A criminal defendant may be considered a limited purpose public figure only where:

> (1) the defendant's conduct is a legitimate matter of public interest to the community; (2) "the press has publicized his conduct in part as a result of his own efforts to obtain publicity"; and (3) defendant's conduct has "made him the target of a criminal proceeding about which the public has a need for information and interpretation." *Talley v. WHIO TV-7*, 131 Ohio App.3d 164, 170, 722 N.E.2d 103 (2d Dist.1998), quoting *Orr v. Argus-Press Co.*, 586 F.2d 1108, 1116 (6th Cir.1978).

The record in this case does not support a finding that Sullins was anything other than a private individual plaintiff. Accordingly, if fault was not presumed, Sullins, as a private individual plaintiff, would need to show that appellees were at least negligent in publishing the false statements about him. Based on the record before us, we believe that Sullins presented sufficient evidence of negligence to defeat summary judgment on that issue.

32-33 (1881); *see also Sweitzer v. Outlet Communs., Inc.*, 133 Ohio App.3d 102, 108, 726 N.E.2d 1084 (10th Dist.1999) (defamatory matter broadcast by means of television is classified as libel), citing *Perez v. Scripps-Howard Broadcasting Co.*, 35 Ohio St.3d 215, 520 N.E.2d 198 (1988), and 3 Restatement of the Law 2d, Torts, Section 568A, at 182 (1977).

{¶19} Sullins's defamation claim is based on appellees' depiction of him as one of "Cleveland's 25 Most Wanted Fugitives," who is evading arrest on an outstanding charge of "passing bad checks." We agree with Sullins that the statements at issue "reflect upon his character" in a manner that would cause him to be "ridiculed, hated, or held in contempt" and "tend to injure" him in his trade or occupation. *Gosden*, 116 Ohio App.3d at 206-207, 687 N.E.2d 481; *Ratkosky*, 2009-Ohio-5690, at ¶ 46; *see also Miller*, 2008-Ohio-1280, ¶ 13 (observing that publication of dismissed warrant for plaintiff's arrest "is arguably defamatory per se"). Accordingly, we find that the inaccurate depiction of Sullins on the *Warrant Unit* program as a fugitive presently wanted and evading arrest on an outstanding warrant for passing bad checks is defamation per se. The innuendo that Sullins is a bad check artist is defamation per quod.

### Statutory Fair Report Privilege and Common-Law Qualified Privilege

{¶20} A defamatory statement, however, must also "be examined in the context of privilege." *Miller*, 2008-Ohio-1280, at ¶ 13, citing *McCartney v. Oblates of St. Francis deSales*, 80 Ohio App.3d 345, 609 N.E.2d 216 (6th Dist.1992). Ohio law recognizes a statutory privilege to defamation for fair reports of governmental proceedings, official

records, or other information received from the government made in the public interest. Ohio also recognizes a common-law qualified privilege. Where a defamatory statement falls within the scope of the statutory fair report privilege or common-law qualified privilege, the statement is not actionable unless the plaintiff establishes that the statement was published with actual malice, i.e., with knowledge of its falsity or with reckless disregard of whether it was false or not, to overcome the privilege. *See, e.g., Lennon*, 2006-Ohio-2587, at ¶ 26; *Jackson*, 117 Ohio St.3d 328, 2008-Ohio-1041, 883 N.E.2d 1060, at ¶ 10, citing *Jacobs v. Frank*, 60 Ohio St.3d 111, 573 N.E.2d 609 (1991), paragraph two of the syllabus. "Reckless disregard" exists when a publisher of a defamatory statement "acts with a 'high degree of awareness of [the statement's] probable falsity,' or when the publisher 'in fact entertained serious doubts as to the truth of his publication.'" (Citations omitted.) *Id.* Where a defamatory statement is subject to a qualified privilege, "actual malice will not be presumed." *Miller* at ¶ 13, citing *Hahn v. Kotten*, 43 Ohio St.2d 237, 244, 331 N.E.2d 713 (1975).

**{¶21}** The trial court held that the depiction of Sullins on the *Warrant Unit* program was protected by Ohio's statutory fair report privilege. The fair report privilege originated at common law and has been codified, in part, at R.C. 2317.05. R.C. 2317.05 provides, in relevant part:

> The publication of a fair and impartial report of * * * the issuing of any warrant * * * is privileged, unless it is proved that the same was published maliciously, or that defendant has refused or neglected to publish in the same manner in which the publication complained of appeared, a reasonable written explanation or contradiction thereof by the plaintiff * * *.

**{¶22}** Sullins argues that the trial court erred in entering summary judgment based on the statutory fair report privilege in light of evidence that (1) the sheriff's department provided the warrant information to appellees on the condition that they check the warrant status before using the information and (2) appellees failed to include all of the relevant information contained in Sullins's booking sheet in their report. We agree.

**{¶23}** In assessing whether summary judgment was properly granted based on the fair report privilege, we must determine "whether reasonable minds, upon reviewing the facts in the case, could reach 'but one conclusion'" as to whether the depiction of Sullins on the *Warrant Unit* program was "substantially accurate." *Young v. Morning Journal*, 76 Ohio St.3d 627, 628, 669 N.E.2d 1136 (1996). Based on the record in this case, we find that reasonable minds could reach different conclusions regarding that issue.

**{¶24}** The fair report privilege does not require a "verbatim reproduction of the official record" or other information obtained from the government in order for a published report based on the record or governmental information to fall within the scope of the privilege. *Oney v. Allen*, 39 Ohio St.3d 103, 529 N.E.2d 471 (1988), paragraph one of the syllabus. The privilege applies if the defendant demonstrates that the publication: (1) deals with a matter of public concern and (2) is "a fair and substantially accurate account" of the official record or governmental information. *Dinkel v. Lincoln Publishing (Ohio), Inc.*, 93 Ohio App.3d 344, 346, 638 N.E.2d 611 (12th Dist.1994); *Oney* at paragraph two of the syllabus. A publication is "substantially accurate" if it "conveys the essence of the official record to the ordinary reader, without misleading the

reader by the inclusion of inaccurate extra record information or the exclusion of relevant information in the record." *Id.* at paragraph three of the syllabus. A plaintiff "cannot defeat summary judgment by raising purported minor discrepancies between the [report] and the official information." *Dinkel* at 346. Variances from the verbatim record are permitted so long as the "gravaman," "gist," "sting," or "substance" of the underlying report is substantially correct. *Pollock*, 117 Ohio App.3d at 368, 690 N.E.2d 903. "Errors as to secondary facts, that is, facts which do not change the import of the story or substantially alter the substance of the alleged defamatory (but protected) aspect of the story, are not actionable." *Dinkel* at 346; *see also Young v. Gannett Satellite Information Network*, 837 F.Supp.2d 758, 764 (S.D.Ohio 2011).

{¶25} In this case, it is undisputed that the warrant information appellees obtained from the sheriff's department was inaccurate. However, appellees contend that because the inaccurate information reported on the *Warrant Unit* program was taken from an official governmental record, i.e., printouts from the sheriff's department's IMACS warrant tracking system, and other "governmental information," i.e., the sheriff's department's oral representation that there was an outstanding warrant for Sullins's arrest for passing bad checks as of the date it compiled the "fugitive file" materials for appellees, their defamatory depiction of Sullins on the *Warrant Unit* program falls within the scope of the fair report privilege.[4] Appellees further argue (and the trial court so

---

[4]Sullins argues that because appellees did not receive a copy of the actual warrant or any other "official" documentation indicating that there was an outstanding warrant for Sullins's arrest for "passing bad checks," they could not

held) that because they published the same information as was contained in the sheriff's department's IMACS system "without adding to or subtracting any information," appellees' depiction of Sullins was a "substantially accurate" report, entitling appellees to the protection of the fair report privilege as a matter of law. We disagree.

{¶26} A report based on inaccurate official records or inaccurate governmental information may be protected by the fair report privilege. *See, e.g., Smitek v. Lorain Cty. Printing & Publishing Co.*, 9th Dist. Lorain No. 94CA006023, 1995 Ohio App. LEXIS 4527 (Oct. 11, 1995) (reports based on inaccurate official records protected against defamation claim by fair report privilege); *see also Martinez v. WTVG, Inc.*, 6th Dist. Lucas No. L-07-1269, 2008-Ohio-1789, ¶ 27-29 (where governmental official gave newspaper the wrong mug shot, report using mug shot "inaccurately accessed" by governmental official was protected against defamation claim by fair report privilege). In this case, however, the "governmental information" appellees used in producing the *Warrant Unit* program included an explicit caveat. Although the sheriff's department represented, based on the information in its IMACS system, that warrants were

_____

claim the protection of the fair report privilege. The fair report privilege is not, however, limited to the publication of information from "official" documents, but rather, also protects reports of "information provided by the government," whether the information was provided orally or in writing. *Mastandrea v. Lorain Journal Co.*, 65 Ohio App.3d 221, 232, 583 N.E.2d 984 (11th Dist.1989). The "information provided by the government" in this case consisted of the printouts from the IMACS system and the additional representations made by the sheriff's department that the suspects for whom file information was provided were subject to outstanding warrants. Reports of such "governmental information" may be protected from defamation claims based on the fair report privilege if the requirements for application of the privilege are otherwise satisfied.

outstanding for Sullins and the other suspects to be featured on the *Warrant Unit* program as of the date the information was compiled for appellees' use, it also knew that the status of a warrant could change at any time, and, therefore, instructed Pinpoint Media "all the time" to update the warrant information it received from the sheriff's department by checking the public docket for the Cuyahoga County Court of Common Pleas prior to airing. **{¶27}** Although the sheriff's department represented that the warrant information it provided was accurate only as of the date the information was compiled for appellees, appellees did not reflect that limitation in publishing the information relating to Sullins. Appellees did not include, as part of the broadcast, the date as of which the warrant information reported on the program was believed to be accurate.

**{¶28}** Further, in opposing appellees' motions for summary judgment, Sullins presented evidence that appellees never properly updated the warrant information they received by checking the court's docket, as instructed by the sheriff's department. Sullins also presented evidence that if appellees had properly checked the court's docket prior to airing, they would have discovered (1) that Sullins's warrant for passing a bad check had been recalled more than a year earlier and (2) that Sullins had already been convicted of, and served his sentence for, that offense. Sullins also pointed out that the "booking sheet" appellees received from the sheriff's department that was linked to the warrant for Sullins's arrest in the IMACS system identified his "inmate status" as "convicted." All of this arguably "relevant information," included in the IMACS printouts and other "governmental information" received from the sheriff's department,

was excluded from the broadcast.

{¶29} Based upon our independent review of the record and viewing the evidence in the light most favorable to Sullins, we believe that reasonable minds could reach different conclusions as to whether appellees' depiction of Sullins as one of "Cleveland's 25 Most Wanted Fugitives," evading arrest on a present charge of passing bad checks, was a fair and "substantially accurate" report of the governmental information and records upon which it was based. Accordingly, we find that the trial court erred in granting summary judgment to appellees based on the fair report privilege. *See, e.g., Young,* 76 Ohio St.3d 627, 669 N.E.2d 1136 (trial court erred in granting summary judgment based on R.C. 2317.05 privilege where report excluded relevant information — i.e., middle initial of individual — and included inaccurate extra-record information — i.e., where the individual allegedly resided — which "could be considered misleading to the ordinary reader").

{¶30} As an alternative basis for affirming the trial court's award of summary judgment in favor of appellees, Crime Stoppers and Pinpoint Media argue that Ohio's common-law qualified privilege shields appellees from liability on Sullins's defamation claim. This privilege "applies in a variety of situations where society's interest in compensating a person for loss of reputation is outweighed by a competing interest that demands protection." *A & B-Abell Elevator Co.*, 73 Ohio St.3d at 8, 651 N.E.2d 1283. The privilege "does not attach to the communication, but to the occasion on which it is made." *Gilbert v. WNIR 100 FM*, 142 Ohio App.3d 725, 739, 756 N.E.2d 1263 (9th

Dist.2001), citing *A & B-Abell Elevator Co.*, 73 Ohio St.3d at 8-9, 651 N.E.2d 1283. The "essential elements" necessary to establish a common-law qualified privilege are "'good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only.'" *Garofolo v. Fairview Park*, 8th Dist. Cuyahoga Nos. 92283 and 93021, 2009-Ohio-6456, ¶ 19 fn.3, quoting *Hahn*, 43 Ohio St.2d at 244, 331 N.E.2d 713.

{¶31} Appellees' argument for application of the common-law qualified privilege is based on the same facts and evidence as their argument for application of the statutory fair report privilege. Appellees contend that they acted in good faith, that their publication of the statement regarding Sullins furthered a public interest — i.e., "apprehending fugitives" by "alert[ing] citizens to the presence of dangerous criminals," "incentiviz[ing] citizen-police communication," and "pressur[ing] wanted criminals into facing justice." Appellees further contend that the publication was limited to that purpose and that the statement was published in a proper manner. However, the record is clear that "apprehending fugitives" was not the only purpose for which the *Warrant Unit* program was broadcast. As Pinpoint Media's president and executive producer, Christopher Rech, testified, "inasmuch as [it] * * * drives viewership," one of Pinpoint Media's primary purposes in broadcasting the *Warrant Unit* program — which provides "roughly" 50 percent of Pinpoint Media's revenues — was to entertain.[5]

---

[5]Because this was arguably not a consideration for Crime Stoppers, Crime Stoppers may have a somewhat stronger case for application of the common-law qualified privilege.

**{¶32}** For this reason and the reasons we determined appellees were not entitled to summary judgment based on the statutory fair report privilege, we find that there are genuine issues of fact regarding whether appellees acted in "good faith," whether the statement at issue was sufficiently limited to the public interest to be upheld, and whether the statement was published in a proper manner. As such, appellees are not entitled to summary judgment based on the common-law qualified privilege.[6]

### Substantial Truth and Incremental Harm Doctrines

**{¶33}** Appellees also contend that even if their defamatory statements were not privileged, the trial court's entry of summary judgment should be upheld based on the substantial truth and incremental harm doctrines.

**{¶34}** While a plaintiff must prove falsity as an element of a defamation claim, a publisher may also "completely defend" a defamation action "by showing that the gist, or imputation, of the [defamatory] statement is substantially true, and hence, the statement is not false." *Sweitzer*, 133 Ohio App.3d at 110, 726 N.E.2d 1084, citing *Natl. Medic Servs. Corp. v. E. W. Scripps Co.*, 61 Ohio App.3d 752, 755, 573 N.E.2d 1148 (1st Dist.1989); *see also Stohlmann*, 2006-Ohio-6408 at ¶ 13 ("Truth is an absolute defense to

---

[6]Because we conclude that there is a factual issue as to whether a privilege applies, we do not reach the issue of whether any privilege was overcome by a showing of actual malice. *See, e.g., Martinez v. WTVG, Inc.*, 6th Dist. Lucas No. L-07-1269, 2008-Ohio-1789, ¶ 33-38; *Young*, 837 F.Supp.2d at 764 fn.3; *cf. Miller*, 2008-Ohio-1280 at ¶ 21 (noting that if plaintiff had pointed to "other similar situations in which police officers erred in verifying the validity of warrants, her argument that a genuine issue of fact exists concerning actual malice would be stronger").

defamation."), citing *Krems v. Univ. Hosps. of Cleveland*, 133 Ohio App.3d 6, 726 N.E.2d 1016 (8th Dist.1999); *Bruss v. Vindicator Printing Co.*, 109 Ohio App.3d 396, 400, 672 N.E.2d 238 (7th Dist.1996) (material falsity is an essential element to a defamation claim).

{¶35} Here, appellees contend that because Sullins had other outstanding warrants — for traffic offenses —  and had already been convicted of passing one bad check when the program aired, there was no "substantial difference between what [was] complained of and the literal truth" and "no more harm to [Sullins's] reputation than the literal truth."

{¶36} There is, however, a significant difference between a warrant for misdemeanor traffic offenses and a warrant for "passing bad checks," a felony involving fraud, deceit, and dishonesty.  Nor does the fact Sullins was previously convicted of one count of passing a bad check necessarily negate the alleged harm resulting from appellees' inaccurate report that Sullins was, at the time the program aired, *presently wanted* and *evading arrest* for passing *multiple* bad checks.  Sullins had already served the sentence for the one count of passing a bad check to which he had previously pled guilty at the time the program aired.  Someone viewing the program, who had been aware of Sullins's prior conviction, might have reasonably believed that Sullins had been charged with new, unrelated counts of passing bad checks, i.e., that he was a "bad check artist," potentially causing further harm to Sullins's reputation.  Moreover, appellees did not simply report that there was an outstanding warrant for Sullins's arrest for "passing

bad checks" but identified him as one of "Cleveland's 25 Most Wanted Fugitives," offered an award for information leading to his arrest, and warned viewers against attempting to apprehend Sullins themselves: "You leave that to the professionals" — as if to suggest that Sullins was a case for the Cleveland Police Department's SWAT team.[7]

{¶37} As the Montana Supreme Court aptly explained in *Hale v. Billings, Montana Police Dept.*, 295 Mont. 495, 1999-MT-213, 986 P.2d 413 (1999), use of the terms "most wanted" and "fugitive" in describing a suspect have significant negative implications:

> The term "most wanted" is offered for public consumption for a singular purpose: to warn that the person in question, above all other ordinary wanted persons, is the focus of intense scrutiny by law enforcement personnel, thus providing a clear connotation that the person has been identified as such based on undisclosed facts. * * *

> Likewise, the term "fugitive" suggests but one urgent message to the intended hearer: the suspect has allegedly committed a crime, has eluded capture, and is now fleeing justice. * * * Once offered for public consumption, the term inherently connotes that police are in pursuit of the person, and that the person is, with knowledge of the pursuit, actively avoiding confrontation or capture by either fleeing or hiding. * * * *Id.* at ¶ 30-31.

{¶38} Whether a defamatory statement is substantially true is generally a question of fact. *Young v. Gannett Satellite Information Network*, 837 F. Supp.2d 758, 764 (S.D.Ohio 2011), citing *Sweitzer*, 133 Ohio App.3d at 110, 726 N.E.2d 1084. In this case, apart from excluding suspects with outstanding warrants for probation violations

---

[7] We seriously question the identification of Sullins as one of "Cleveland's 25 Most Wanted Fugitives." If Sullins was one of "Cleveland's 25 Most Wanted Fugitives" based on a charge of passing a bad check, Cleveland must be one of the safest communities in the country.

and drug offenses and ensuring that the suspects were not all black males, no particular methodology appears to have been used to identify those suspects with outstanding warrants who would be featured as "Cleveland's 25 Most Wanted Fugitives" on the *Warrant Unit* program. Based upon the apparently random manner in which suspects were selected for the program, we find that reasonable minds could conclude that Sullins was not, under any "ordinary, plain-meaning definition" of the term, a "most wanted" "fugitive" at the time the *Warrant Unit* program aired. *See Hale*, 295 Mont. 495, 1999-MT-213, 986 P.2d 413, at ¶ 21(trial court erred in entering summary judgment on defamation claim arising from alleged defamatory depiction of plaintiff as a "fugitive" who "may be armed and dangerous" on "Yellowstone County's Most Wanted" cable television program).

{¶39} Accordingly, we find that a genuine issue of material fact exists as to whether appellees' depiction of Sullins as one of "Cleveland's 25 Most Wanted Fugitives," evading arrest on a present charge of passing multiple bad checks, was "substantially true." Therefore, appellees are not entitled to summary judgment based on the substantial truth doctrine.

{¶40} Appellees also contend that they are entitled to summary judgment based on the "incremental harm doctrine." The incremental harm doctrine "measures the incremental reputational harm inflicted by the challenged statements beyond the harm imposed by the nonactionable remainder of the publication." *Ferreri v. Plain Dealer Publishing Co.*, 142 Ohio App.3d 629, 642-643, 756 N.E.2d 712 (8th Dist.2001). Even

if a statement is false, if the incremental harm caused by the false statement is determined to be "nominal or nonexistent," i.e., causes no more harm to the plaintiff than the truth, the false statement is not actionable. *Id.*

**{¶41}** Appellees contend that because numerous warrants had been issued for Sullins's arrest and because Sullins had already been convicted of one count of passing a bad check, appellees' representation in the *Warrant Unit* program that Sullins was wanted on a present charge of evading arrest for passing multiple bad checks "could cause no greater harm than the literal truth." Sullins argues that because there were no non-defamatory aspects of the statements at issue, i.e., appellees depicted him as a "most-wanted" "fugitive" for "passing bad checks" and said nothing else about him, appellees could not attribute any reputational injury to any non-defamatory aspects of the statements, and that the incremental harm doctrine, therefore, does not apply.

**{¶42}** None of the cases cited by the parties involving the incremental harm doctrine applied the doctrine to a statement that was determined to be defamatory per se. We do not believe the incremental harm doctrine bars a claim for defamation, where, as here, the plaintiff's defamation claim is based on statements that are defamatory per se. However, even if the incremental harm doctrine applied in this case, for the reasons discussed above, it would involve issues of fact for the jury to decide. Accordingly, appellees are not entitled to summary judgment based on the incremental harm doctrine.

**Responsibility for Defamatory Depiction of Sullins**

**{¶43}** Finally, WOIO and Crime Stoppers argue that summary judgment was properly entered as to them because they had little or no role in the production of the *Warrant Unit* program. Although the narrator states at the outset of the program that the *Warrant Unit* program "is a production of Cuyahoga County Crime Stoppers," Crime Stoppers maintains that it was nothing more than a "delivery person" who "owed Sullins no duty of care." WOIO similarly contends that it should have no liability for any defamatory statements made on the *Warrant Unit* program because it simply broadcast the program and had no role in creating, producing, or editing it. Based on our review of the record and the applicable law, we find that there are genuine issues of material fact as to who, if anyone, bears responsibility for the defamatory depiction of Sullins on the *Warrant Unit* program. We, therefore, decline to affirm the trial court's entry of summary judgment on that basis.

**{¶44}** Based upon our independent review of the record, we find that there are genuine issues of material fact as to whether appellees' depiction of Sullins on the *Warrant Unit* program constitutes actionable defamation. Accordingly, we reverse the trial court's entry of summary judgment on Sullins's defamation claim, affirm the entry of summary judgment on Sullins's false-light invasion of privacy claim, and remand the case to trial court for further proceedings consistent with this opinion.

**{¶45}** Judgment affirmed in part and reversed in part; remanded.

It is ordered that appellant recover from appellees costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
KENNETH A. ROCCO, JUDGE

MARY J. BOYLE, P.J., and
PATRICIA A. BLACKMON, J., CONCUR