[Cite as *Hartman v. Kerch*, 2023-Ohio-1972.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| CRAIG HARTMAN, ET AL., | : | |
| Plaintiffs-Appellants, | : | No. 111928 |
| v. | : | |
| JANIS KERCH, | : | |
| Defendant-Appellee. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART, REVERSED IN PART, AND REMANDED
**RELEASED AND JOURNALIZED:** June 15, 2023

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-21-946506

### *Appearances:*

Harvey + Abens Co., LPA, David L. Harvey III, and Matthew B. Abens, *for appellants*.

Gallagher Sharp LLP, James T. Tyminski, Jr., and Liz R. Phillips; Ritzler, Coughlin & Paglia, Ltd., and Thomas M. Coughlin, Jr., *for appellee*.

MARY J. BOYLE, J.:

{¶ 1} Plaintiffs-appellants, Craig Hartman ("Hartman") and Marc Cashin ("Cashin") (collectively referred to as "Husbands"), have asked us to determine whether (1) the written statement "[t]hey prey on older single women" is defamatory per se and (2) defendant-appellee, Janis Kerch ("Declarant"), the older single woman who made the statement, is liable as a matter of law. Husbands argue that the trial court erred when it found this statement was not defamatory per se, granted Declarant's motion for summary judgment, and denied theirs. For the reasons set forth below, we affirm the denial of Husbands' motion for partial summary judgment on the issue of liability only, reverse the granting of Declarant's motion for summary judgment, and remand to the trial court for further proceedings.

## I. Facts and Procedural History

{¶ 2} This appeal stems from a dispute amongst neighbors in the Olympia Homeowners Association ("Olympia"), a 55 and over community in Strongsville, Ohio. Husbands moved to Olympia in March 2017 and were involved in community activities and committees beginning in May 2017.

{¶ 3} Declarant is also a resident of Olympia. Initially, Husbands and Declarant had a good relationship. However, their relationship changed when Declarant served as Olympia's board president:

> DECLARANT: [Husbands] were friends of mine the first two years they were there.
>
> HUSBANDS' COUNSEL: What made you become not friends with them?

DECLARANT: They were very friendly with me, and they would offer to do things. They came into my home and they put together a desk for me. And then when I became president of the association in 2019, they began to push back with different rules and regulations to do with, with the homeowners' association. And finally, I guess — I mean, we just stopped being friends. I mean, we didn't have any big falling out.

(Declarant Dep. 11/30/21, tr. 31.) Declarant further testified that the deterioration of their friendship was related to Husbands disagreeing with the way she was performing her duties as Olympia's president. Hartman explained the decline in Husbands relationship with Declarant as follows:

She didn't like the way I; certain things that I did, she just thought that that was not acceptable. * * * [W]hen I was the committee chair, she had several issues about the way certain things were accomplished, because she would hear some griping from some of the people, as well as following the rules properly.

(Hartman Dep. 10/29/21, tr. 74.)

{¶ 4} Beginning in March 2020, Declarant, the board, and other Olympia residents, became "annoyed" by "nuisance things" that were happening in the clubhouse for which Husbands were suspected of and seen doing. (Declarant Dep. 11/30/21, tr. 44.) During this time, Declarant had an advisory role on Olympia's board because she was president the year before. Fred Morey ("Board President"), the then current board president, explained that Olympia's governing documents provide that a former board president's role is extended for one year "to support the new president coming in," "to help," and "to act as a consultant." (Board President Civ.R. 30(B)(5) Dep. 03/15/22, tr. 5-6.)

{¶ 5} According to Declarant, on May 18, 2020, Board President asked her "opinion" about the ongoing nuisance activities transpiring in the clubhouse: "He was new to the president, fairly new to the clubhouse. And he was being made aware of activities going on * * * and he was just asking my opinion of what was happening there." (Declarant Dep. 11/30/21, tr. 80.) Declarant claimed that she typed a letter on May 26, 2020, to provide her "opinion" about "some of the activity" and "the most recent issues that [she] was aware of." (Declarant Dep. 11/30/21, tr. 78-79 and 91) Declarant testified:

> I put it in writing because [Board President] asked me a question, and I took the time to put some thoughts down. And I folded it and handed it to him. I put my initials on it because it was the only copy of it. It was never discussed again at a board meeting and there was no — it was his information from me — my opinion.

(Declarant Dep. 11/30/21, tr. 81.)

{¶ 6} Board President had a different recollection of his interaction with Declarant:

> [Declarant] called me telling that [Husbands] were there in the clubhouse turning lights on and she mentioned something to them and they got rude with her. And I said, "Well, why don't you just send me something," because I had a lot of complaints at that time for the same thing.
>
> * * *
>
> She called me with a complaint. And at that time I was getting complaints, so I asked people to write to me because verbal didn't do it for me anymore. We had to start documenting those cases.

(Board President Dep. 03/15/22, tr. 22-23.) Board President testified that he was "gathering [information]" on behalf of Olympia and the letter was for "informational purposes." (Board President Dep. 03/15/22, tr. 27).

{¶ 7} Declarant testified, "[The letter] didn't go to the board. It went to [Board President]. * * * It was not presented to the board. I was at those meetings. It never went beyond [Board President]." (Declarant Dep. 11/30/21, tr. 133.) Board President confirmed that he put Declarant's letter, along with other complaints he received, in a separate personal folder and never submitted it to the Olympia board. He stated, "The only people that saw this document was [Declarant] and myself." (Board President Dep. 03/15/22, tr. 29.) Board President further testified that specifics about Declarant's letter were not discussed with the Board, rather the overall theme of everything he collected was.

{¶ 8} At the end of May 2020, Husbands each received letters from the Board President advising them that they had been removed from certain Olympia committees and their positions were relinquished as of June 15, 2020. A reason for Husbands removal was not provided in the letters. Hartman had a conversation with Board President about the letters sometime in June. Board President did not provide any specific details but told Hartman that Husbands were removed as a result of some written complaints. Husbands also received a letter from Olympia's attorney that purportedly stated Husbands were (1) "a disruption," (2) removed

from all committees they were involved in, and (3) prohibited from participating in any Olympia committees. Again, no basis was provided.[1]

{¶ 9} Husbands hired an attorney and communications were exchanged with Olympia's counsel and board. Olympia's counsel subsequently issued a "retraction letter" stating "that [Husbands] were not thrown off any committees." (Cashin Dep. 10/29/21, tr. 33-34.) In September 2020, Husbands, their attorney, Olympia's board, and its attorney attended a meeting to resolve the matter. At the meeting, it was emphasized that Husbands were removed from Olympia committees after 16 written complaints were received from residents. A discussion was also had regarding problems that resulted from Hartman's management of certain committees and Husbands' nonperformance of all duties. The meeting concluded without resolution.

{¶ 10} Thereafter, Husbands "ask[ed] for letters and things like that" because "[Olympia's board] said there were [written complaints] against [them]" and Husbands wanted to know "what the [written complaints] were." (Hartman Dep. 10/29/21, tr. 48-49.) Husbands received a "packet of information" from Olympia's board in response. (Hartman Dep. 10/29/21, tr. 48). According to Cashin, the packet included 15 letters. Hartman testified that the letters discussed displeasure with decisions made by the committees from which Husbands were removed. Cashin testified that the letters also reported disapproval of Hartman's

---

[1] The letters from Board President and Olympia's counsel are not included in the record. Therefore, our understanding of the letters' contents is limited to Husbands' testimony regarding said correspondence.

behavior in the community building. Declarant's letter was among the written complaints received by Husbands. The letter states:

> To: Fred Morey
> From: Janis Kerch
> Date: 26 May, 2020
> Subject: Ongoing aggressive activity at the Olympia Clubhouse
>
> On Memorial Day at approx 2pm JoAnn Thomas was at the clubhouse alone to use the fitness center. Marc Cashin came in and turned on lights and fans. He then left and JoAnn turned off lights, etc.
>
> I arrived at approx 3:30 and said Hello to JoAnn and she told me about Marc coming in. JoAnn had signed in as had I and later Monika Petrich. I was working in the library and Monika came in and we talked for a while then went out to the lobby. Marc and Craig Hartman burst in the door about 4:20, started turning on lights and Monika said what are you doing? They both started ranting about it was their right. Craig went to a great deal of trouble to crawl behind the puzzle desk to turn on that light. He then realized there was no bulb and started yelling "there is a thief in the clubhouse." Something needs to be done.
>
> Marc and Craig have become emboldened in their behavior and are trying to create confrontation with anyone who watches what they are doing. They are menacing and creating a terrible divide in both the clubhouse and the neighborhood. They prey on older single women telling them they will do whatever is needed and going in to homes and pretending to be great helpers.
>
> I said to Monika let's go and as we were leaving they both said sarcastically "Have a nice day." They have said this before to me as if to say "we have the last word" and "we can do whatever we want to do to torment neighbors."
>
> I submit this to you and the Board as documentation of my personal experience with M Cashin and C Hartman.

{¶ 11} We note that the record before us only contains Declarant's letter; no other written complaints about Husbands were included or otherwise incorporated therein. Board President, however, testified that "[p]eople were upset" and "there

was a letter that was sent in with 19 names on it" as well as other written complaints "from other things also, it's not just [Husbands' behavior in the clubhouse.]" (Board President Dep. 03/15/22, tr. 23-24.)

{¶ 12} While Husbands disagreed with Declarant's recounting of events in the clubhouse, they ultimately contested Declarant's letter because it included the statement "[t]hey prey on older single women * * *." ("Statement"). Husbands filed a two-count complaint against Declarant in April 2021 raising claims of defamation per se and defamation per quod. The first count alleged the Statement was defamatory per se because it would tend to injure a person in their trade or occupation or would tend to subject a person to public hatred, ridicule, or contempt. In the alternative, the second count alleged the Statement was defamatory per quod because readers could understand the defamatory nature and meaning of Declarant's comment.

{¶ 13} Declarant filed an Answer in June 2021, asserting a number of defenses including that Husbands were barred from recovery because the Statement was one of opinion, subject to qualified privilege, and made in good faith. Discovery commenced, and the depositions of Husbands, Declarant, and Board President, both individually and in his capacity as a representative of Olympia, were obtained.

{¶ 14} Declarant testified that "[Hartman] has had confrontations with [her] on several occasions." (Declarant Dep. 11/30/21, tr. 14.) Declarant described an incident in 2019 where she and her sister were "shouted at" by Hartman. Declarant also described another incident in May 2020 when both Husbands "started the same

shouting" at Declarant and another female resident. Declarant further testified that she considered Husbands ongoing activity "aggressive" because Husbands were "speaking sharply" to residents who asked what they were doing in the clubhouse:

> [P]eople, when they're being spoken to rudely and — or when someone asks [Husbands] what they're doing — it wasn't just myself. Other people were spoken to rudely by them. And just standing there and staring at someone and saying something, I consider aggressive.

(Declarant Dep. 11/30/21, tr. 83.) Declarant claimed that Husbands were "emboldened in their behavior" because they "used to just come in [to the clubhouse] when nobody was there * * * [a]nd then * * * would just come in and confront [residents]." (Declarant Dep. 11/30/21, tr. 92.) Declarant specifically named two female residents who had experienced Husbands' confrontational behavior. Board President also testified that many Olympia residents were getting into arguments with Husbands in the clubhouse, including one "80-some year[ ] old," "fragile" male resident ("Male Resident") who "was fearful of dealing with [Husbands]." (Board President Dep. 3/15/22, tr. 47.) Declarant further testified that it was "menacing" when Husbands would say they could do whatever they wanted to do because they paid their dues "because if you can do what you want to do, what else do you want to do?" (Declarant Dep. 11/30/21, tr. 96.)

{¶ 15} Testimony was also offered by Declarant and Board President regarding Husbands' behavior outside of the clubhouse. Declarant claimed that "several days [she] found [her] newspaper at the end of [her] driveway." (Declarant Dep. 11/30/21, tr. 86.) Declarant testified that a neighbor observed Hartman

kicking a newspaper down to the end of the driveway after it was delivered to the front of Declarant's garage door.  Declarant further testified:

> [Husbands] were going around the neighborhood — [Hartman] was — * * * asking people to sign a petition that he was a good neighbor. Which why would you do that unless you thought someone thought you weren't being a good neighbor.  That is being — that's causing a divide in the neighborhood.  People then began to form opinions.  And so it was, it was just creating conflict that didn't need to be happening.

(Declarant Dep. 11/30/21, tr. 95.)

{¶ 16} Board President testified that he had a negative experience with Cashin:  "We were talking, and [Cashin] said, 'If you poke me * * * I'm coming after you,' three times in a meeting in a conversation.  I took that as a personal attack." (Board President Dep. 3/15/22, tr. 14.)  Board President felt Cashin's comment was "menacing."  Board President mentioned that the Male Resident also complained that he felt personally threatened by Husbands.  Board President testified that the Male Resident came to his house crying on two separate occasions because of interactions with Husbands.

{¶ 17} Board President further testified that Husbands "started screaming about [how Board President] removed them [from committees]" in a meeting. (Board President Dep. 3/15/22, tr. 48.)  Hartman stood up and told Board President to shut up.  Board President "jumped up and got in [Hartman's] face" because he felt physically threatened.  (Board President Dep. 3/15/22, tr. 48.)  When asked if anyone else felt physically threatened by Husbands, Board President testified that

Declarant, Male Resident, and two board members "were afraid of how they acted all the time." (Board President Dep. 3/15/22, tr. 48-49.)

{¶ 18} Husbands readily admitted they were responsible for at least some of the "nuisance things" in the clubhouse, which they believed benefited Olympia's elderly or handicapped members. Husbands claimed they were singled out and Olympia's rules were not fairly enforced or consistently followed. Cashin testified:

> The way it works is kind of like a "Melrose Place" in Olympia, okay, everybody knows everybody — you don't know everybody, but you know enough. There are pockets — there is a group of people that, they believe they are — people make fun of them. They call them the A-group. They are the ones that think they control everything and they are in charge * * * and if you go against them or say something against them, then, they make trouble for you.

(Cashin Dep. 10/29/21, tr. 21-22). Cashin further claimed they were harassed and discriminated against by Male Resident and other neighbors.

{¶ 19} Regarding the Statement, Declarant testified:

> I made that statement about preying on older women because I felt like I was part of that. When I first got to know them they were very friendly. They came into my home. They did things for me. And then when I didn't do what they thought I should be doing — which happened with other people. When you didn't go along with their agenda, then they really weren't your friend anymore. And then they started to push back * * *.

(Declarant Dep. 11/30/21, tr. 90.) When asked about her definition of "prey," Declarant stated:

> My, my definition was that they become friends and, and do things for you. And they're fine as long as you go along with their agenda. * * * They prey on you by the way they are so friendly with you. And, and that's how they were. I mean, they came into my home. They put together a desk for me. And then as — because I was the president and

they didn't like the way I was being president, then that was when they started pulling back.  But they also had confrontation with another neighbor, who they were helping.  They were at her house all the time helping her with her husband.  And then when they disagreed with one of her decisions — this is what I was told — then they stopped being friends with her.

(Declarant Dep. 11/30/21, tr. 96.)

{¶ 20} Husbands testified that they believe Olympia's board and counsel reviewed Declarant's letter and, as a result of the Statement, decided to "take action" and prohibit them from participating in the community.  Husbands further testified that they believe the Statement caused Olympia residents to treat them differently and ruined Husbands' reputation within the community.  Hartman testified that some Olympia residents had been "less friendly, less talkative, perhaps, standoff-ish" and that his "reputation has been dragged through the mud by this.  * * *  It's been just unpleasant."  (Hartman Dep. 10/29/21, tr. 58 and 61.)  Cashin testified:

[H]ow do you change five people who believe the letter that took action against you, that thought you were a predator that — I would like to see the people that say I menaced them, that I am confrontational with them.  I am loved by my neighbors and so is [Hartman]; we are loved. When we came to that neighborhood, I think, some of the threat that [Hartman] and I brought to that neighborhood was the fact that we were two younger people that were willing to help out.  What people don't understand is that you have a community that is about 85 years old and about 50% of them are just single women.

That is what the Board, that's what those five Board members took, that letter, and then took action against Craig and I reading that letter, saying we are predators.  That's when [Olympia's attorney] read that letter and sent us a letter saying we cannot participate in our committee.

My embarrassment on that committee, where I was on the committee and then thrown off and then brought back on  * * * then, was told, "No

you can't be part of it" with no reason; wouldn't tell you why, until we went to that September 11th meeting, where they told us that there were sixteen letters.

I don't know if you can put any kind of — how can you come to a resolution?  How do you change people's perceptions?  For the time I lived there, people are going — at least those five people, who believe that letter, who took action against us, they are always going to have side action, they're always going to be looking at us in a different way.

(Cashin Dep. 10/29/21, tr. 66-67.)  Hartman testified that other than reputational damage, he suffered no damage to his job, finances, or anything else.  (Hartman Dep. 10/29/21, tr. 62.)  Cashin testified that he did not suffer any financial damage, however, "sleepless nights" affected his "ability to go into work and not give 110%."  (Cashin Dep. 10/19/21, tr. 47.)  At the time of Hartman's deposition, he was serving a three-year term on Olympia's Board of Trustees.

{¶ 21}  In May 2022, a mediation a was held without resolution and the case was returned to the trial judge's docket for further proceedings.  On June 13, 2022, Husbands voluntarily dismissed count two of their complaint, raising the claim of defamation per quod.  On June 15, 2022, the parties each filed motions for summary judgment.

{¶ 22}  In her motion for summary judgment, Declarant argued that the Statement did not constitute defamation per se as a matter of law because the Statement (1) was substantially true; (2) used imprecise language that should be interpreted as opinion; and (3) did not fall within any of the four classes of statements required to establish defamation per se.  Declarant further argued that the Statement was protected by qualified privilege and subject to the innocent

construction rule.  The following exhibits were attached to Declarant's motion:  an affidavit of Declarant with Olympia's resident handbook and an administrative resolution regarding the consultant role of past presidents attached; cited portions of the deposition transcripts of Declarant, Board President, as an individual, and Board President as an Olympia representative; Declarant's letter; and Husbands' written responses to Declarant's first set of interrogatories and request for production of documents.  In her affidavit Declarant attested to many issues including:

- Her "understanding" that a complaint or concern about the community was to be submitted in writing to Olympia's board president per the guidelines in the resident handbook.

- Her "opinion" that Husbands' activities and behaviors "w[ere] meant to cause confrontations with other residents."

- Her "opinion" that Husbands' helpfulness and friendship was conditioned upon agreeing with them based on her own experience.

- Her "opinion" that Husbands were no longer willing to help or befriend her, an unmarried older woman, based on Husbands' disagreement with how she conducted business as Olympia's president, and therefore, Husbands' friendship was insincere.

- That she typed a letter to Board President discussing the most recent events she witnessed, which included "several personal opinions about [Husbands'] behavior" and "an opinion based on her former friendship with [Husbands]."

- Her "opinion" that some of Husbands actions and behaviors were "menacing, aggressive, and/or intimidating," especially since Husbands are younger men that are physically larger than she is.

- That Board President was the only person she gave a copy of her letter to and she did not otherwise distribute the letter to anyone.

{¶ 23} Husbands filed a motion for partial summary judgment as to the issue of liability only. Husbands claimed the Statement was without basis or support and constituted defamation per se as a matter of law because it was unambiguous and "impugned [Husbands'] reputation by claiming they 'commit violence or robbery or fraud' or 'have an injurious, destructive, or wasting effect' on older women." They further claimed that the Statement "accuses [Husbands] of crimes against the elderly." Husbands also argued that because of Declarant's background, it was "downright absurd" that she "feigned ignorance" and attributed any other meaning to the word "prey." They further argued that because the Statement amounted to defamation per se, Husbands' damages and Declarant's degree of fault should be presumed. Therefore, Husbands requested only the issue of damages be left to the trier of fact. Husbands attached cited portions of the deposition of Husbands, Declarant, and Board President, in his individual capacity, and Declarant's letter.

{¶ 24} The trial court struck Husbands' voluntary dismissal of their defamation per quod claim on June 15, 2022. On June 21, 2022, Declarant filed a motion for leave to file a supplement to her motion for summary judgment instanter in order to address Husbands' defamation per quod claim. Declarant's motion for leave was granted on July 11, 2022.

{¶ 25} On July 13, 2022, Husbands filed a brief in opposition to Declarant's motion for summary judgment. Therein, Husbands indicated that they would not be filing a response to Declarant's supplement seeking summary judgment on Husbands' defamation per quod claim. That same day, Declarant also filed a brief

in opposition to Husbands' motion for partial summary judgment. The parties filed replies in support of their own dispositive motions on July 20, 2022.

{¶ 26} On August 19, 2022, the trial court issued a journal entry granting Declarant's motion for summary judgment and denying Husbands'. Therein, the trial court concluded that Husbands abandoned their defamation per quod claim and dismissed count two of the complaint with prejudice. The trial court found that Husbands were barred from arguing the Statement accused them of "crimes against the elderly" because Husbands failed to identify that class of defamation per se in the complaint. The trial court held that the Statement was not defamatory per se because "no evidence was submitted that either [Husband] was injured in his trade or occupation" and "[Husbands'] own behavior toward many members of the community was the cause of any public hatred, ridicule, or contempt." (Journal Entry, 08/19/22.) The trial court further held that the Statement was one of opinion and, thus, protected speech. In so holding, the trial court found that "[Declarant] may have intended to use to use the word ingratiate or beguile" and, when taken as a whole, the Statement "does not indicate that [Declarant] believes that [Husbands] are criminals or engage in criminal behavior." (Journal Entry, 08/19/22.) Therefore, judgment was granted on behalf of Declarant and against Husbands on all claims.

{¶ 27} Husbands now appeal, raising the following two assignments of error for review, which shall be addressed together because of their common basis in fact and law:

**Assignment of Error I**: The trial court erred in granting [Declarant's] motion for summary judgment.

**Assignment of Error II:** The trial court erred in denying [Husbands'] motion for summary judgment.

## II. Law and Analysis

### A. Standard of Review: Motions for Summary Judgment

{¶ 28} An appellate court reviews the grant or denial of summary judgment de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). In a de novo review, the appellate court affords no deference to the trial court's decision and independently reviews the record to determine whether summary judgment is appropriate. *Hollins v. Shaffer*, 182 Ohio App.3d 282, 2009-Ohio-2136, 912 N.E.2d 637, ¶ 12 (8th Dist.); *Smathers v. Glass*, Slip Opinion No. 2022-Ohio-4595, ¶ 30.

{¶ 29} Summary judgment is appropriate if (1) no genuine issue of any material fact remains; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion and, construing the evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the nonmoving party. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996).

{¶ 30} The party moving for summary judgment bears the burden of demonstrating that no genuine issues of material fact exist for trial. *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293, 662 N.E.2d 264 (1996). The moving party has the initial responsibility of informing the trial court of the basis for the motion and

identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential elements of the nonmoving party's claims. *Id.* "To accomplish this, the movant must be able to point to the evidentiary materials of the type listed in Civ.R. 56(C) that a court is to consider in rendering summary judgment." *Id.* These include "the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any." Civ.R. 56(C). "These evidentiary materials must show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." *Dresher* at 293.

{¶ 31} After the moving party has satisfied this initial burden, the nonmoving party has a reciprocal duty to set forth specific facts by the means listed in Civ.R. 56(C) showing that there is a genuine issue of material fact. *Id.* "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Am. Dental Ctr. v. Wunderle,* 8th Dist. Cuyahoga No. 62548, 1993 Ohio App. LEXIS 4437, 4 (Sept. 16, 1993) citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This court has explained:

> "[T]he plain language of the summary judgment rule mandates the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no 'genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of a non-moving party's case necessarily renders all other facts immaterial."

(Citations omitted.) *Corradi v. Soclof*, 8th Dist. Cuyahoga No. 67586, 1995 Ohio App. LEXIS 2162, *6 (May 25, 1995), quoting *Toensing v. MK-Ferguson Co.*, 76 Ohio App.3d 826, 830, 603 N.E.2d 396 (1992), citing *Celotex Corp.* at 323-324.

{¶ 32} With these principles in mind, we consider whether the trial court's judgment granting Declarant's motion for summary judgment and denying Husbands' motion for partial summary judgment on the issue of liability was error.

## B. Defamation

{¶ 33} "Defamation is a false publication that injures a person's reputation, exposes him to public hatred, contempt, ridicule, shame or disgrace; or affects him adversely in his trade or business." *Kanjuka v. MetroHealth Med. Ctr.*, 151 Ohio App.3d 183, 2002-Ohio-6803, 783 N.E.2d 920, ¶ 15 (8th Dist.). There are two forms of defamation: slander, which refers to spoken defamatory words, and libel, which refers to written defamatory words. *Id.*

{¶ 34} To establish a claim for defamation, a plaintiff must show: (1) a false statement of fact was made about the plaintiff, (2) the statement was defamatory, (3) the statement was published, (4) the plaintiff suffered injury as a proximate result of the publication, and (5) the defendant acted with the requisite degree of fault in publishing the statement. *Am. Chem. Soc. v. Leadscope, Inc.,* 133 Ohio St. 3d 366, 2012-Ohio-4193, 978 N.E.2d 832, ¶ 77.

{¶ 35} Here, Husbands claim Declarant's Statement, "they prey on older single women," rises to the level of defamation and falls within the class of defamatory statements known as defamation per se. In order for Husbands to be

entitled to judgment as a matter of law on their motion for partial summary judgment, they must prove no genuine issues of material fact remain as to *all* elements establishing Declarant's liability. Conversely, Declarant must show that either (1) no genuine issues of material fact remain that Husbands have not sufficiently established *any one* of the essential elements of their defamation claim, or (2) no genuine issues of material fact remain as to *all* elements of Declarant's defense.

{¶ 36} To guide our analysis of each of the five elements of a defamation claim, we note definitions of the verb "prey" include "to commit violence or robbery or fraud," "to have an injurious, destructive, or wasting effect," and "to victimize another or others." *See, e.g.*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/prey; Dictionary.com, https://www.dictionary.com/ browse/prey.

### 1. The First Element: Whether a false statement of fact was made about Husbands

#### i. True or False

{¶ 37} A plaintiff must prove falsity as an essential element of a defamation claim and, because falsity is an essential element, a true statement cannot provide the basis for such an action. *Natl. Medic Servs. Corp. v. E. W. Scripps Co.*, 61 Ohio App.3d 752, 755, 573 N.E.2d 1148 (1st Dist.1989). Therefore, "[i]n Ohio, truth is a complete defense to a claim for defamation." *Montgomery v. Greater Cleveland Regional Transit Auth.*, 8th Dist. Cuyahoga No. 109559, 2021-Ohio-1198, ¶ 30,

citing *Ed Schory & Sons v. Francis*, 75 Ohio St.3d 433, 445, 662 N.E.2d 1074 (1996); *Swoope v. Osagie*, 2016-Ohio-8046, 76 N.E.3d 686, ¶ 33 (8th Dist.) (noting that while a plaintiff must prove falsity as an element of a defamation claim, a publisher may also "completely defend" a defamation action by showing substantial truth). "'It is sufficient [in defending against a defamation action] to show that the imputation is substantially true, or as it is often put, to justify the "gist," the "sting," or the substantial truth of the defamation.'" *Krems v. University Hosps. of Cleveland*, 133 Ohio App. 3d 6, 9, 726 N.E.2d 1016 (8th Dist.1999), quoting Prosser, The Law of Torts, 798-799 (4th Ed. 1971). Whether a defamatory statement is substantially true is a question of fact and summary judgment may only be granted if no genuine issue of material fact exists after the submission of evidence pursuant to Civ.R. 56. *Montgomery* at ¶ 30-31 citing *Sweitzer v. Outlet Communications, Inc.*, 133 Ohio App.3d 102, 110, 726 N.E.2d 1084 (10th Dist.1999), and *Roe v. Heap*, 10th Dist. Franklin No. 03AP-586, 2004-Ohio-2504, ¶ 22.

{¶ 38} Husbands argue that the Statement is "without any basis" and, therefore, "cannot be substantially true." Husbands claim that "a fractured friendship between the parties and some petty HOA politics concerning [Husbands'] behavior" does not amount to "preying on older single women." Husbands further point to the plural form of the word "women" used in the Statement and argue that Declarant "fail[ed] to proffer any evidence of alleged predatory behavior beyond her own failed friendship." On the other hand, Declarant claims the Statement is substantially true and "that due to the power dynamics of age, strength, and gender,

as well as [Husbands'] insincere presentation of friendship, they can be said to have 'preyed' upon the good nature of [Declarant]." Therefore, Declarant claims the "gist" or "sting" of her statement is accurate and any error in terminology does not prevent the Statement from being substantially true.

{¶ 39} Our review of the record and Civ.R. 56 evidence reveals significant deposition testimony was offered by Declarant and Board President regarding Husbands' behavior toward others in the community. Declarant testified that Husbands were confrontational and would shout and speak sharply and rudely to her as well as other Olympia residents. Declarant recounted an incident where Hartman kicked a newspaper down her driveway and testified that Husbands' behaviors were aggressive and menacing. Declarant further testified that Husbands were creating conflict within Olympia.

{¶ 40} Board President testified that he received a number of written complaints from Olympia residents regarding Husbands. Board President further testified that many Olympia residents were getting into arguments with Husbands and some residents felt physically threatened. Board President advised that Male Resident was fearful of dealing with Husbands and claimed that both he and Male Resident had encounters with Husbands where they felt personally attacked and physically threatened.

{¶ 41} An affidavit was also submitted by Declarant in support of her motion for summary judgment. In her Affidavit, Declarant attested that Husbands friendship and helpfulness was insincere and premised upon agreeing with them.

Declarant further attested that she found Husbands' behaviors to be confrontational, menacing, aggressive, and intimidating. This evidence suggests the Statement may be substantially true.

{¶ 42} However, we find neither the record nor the Civ.R. 56 evidence clearly establish whether the Statement was false or substantially true. Reasonable minds could come to two different conclusions: (1) Husbands' actions and behaviors were "predatory" or (2) Husbands actions and behaviors did not rise to the level of "preying on older single women." Therefore, we find that a genuine issue of material fact remains and summary judgment cannot be granted to either party on this basis.

{¶ 43} Accordingly, Husbands' second assignment of error is overruled. Because reasonable minds could come to different conclusions as to an essential element of Husbands' defamation claim, Husbands' motion for partial summary judgment was properly denied by the trial court. We continue our analysis to determine whether the court erred in granting Declarant's motion for summary judgment.

### ii. Fact or Opinion

{¶ 44} The first element of a defamation claim also requires the alleged defamatory statement be one of fact rather than opinion. The expression of an opinion is generally immune from liability under the Ohio and United States Constitutions. *Vail v. The Plain Dealer Publishing Co.*, 72 Ohio St.3d 279, 280, 649 N.E.2d 182 (1995). "'This is because 'there is no such thing as a false idea.'"

*Lograsso v. Frey*, 2014-Ohio-2054, 10 N.E.3d 1176, ¶ 30 (8th Dist.), quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

{¶ 45} Whether allegedly defamatory language is opinion or fact is a question of law to be decided by the court. *Scott v. News-Herald*, 25 Ohio St.3d 243, 250, 496 N.E.2d 699 (1986). To answer this question, a court must determine whether a reasonable reader or hearer will perceive the statement as a fact or opinion. *McKimm v. Ohio Elections Comm.*, 89 Ohio St.3d 139, 144, 729 N.E.2d 364 (2000). "The meaning of a communication is that which the recipient correctly, or mistakenly but reasonably, understands that it was intended to express." *Id.* at 145.

{¶ 46} When determining whether speech is protected opinion, Ohio courts apply a totality-of-the-circumstances analysis and consider the following four factors: (1) the specific language at issue, (2) whether the statement is verifiable, (3) the general context of the statement, and (4) the broader context in which the statement appeared. *Scott* at 250. The application of this test is "fluid," and the weight given to any one factor will necessarily vary depending on the circumstances of each case. *Id.*

{¶ 47} Husbands argue that "the trial court made an erroneous factual determination that [Declarant] did not intend to call [Husbands] predators, thereby making her statement one of opinion." Husbands further argue that the trial court's ruling contained no analysis of the totality-of-the-circumstances factors, which weigh in favor of finding the Statement is actually one of fact. Conversely, Declarant

argues that the trial court properly determined the Statement was opinion because it was imprecise and subjective. Declarant further argues that application of the totality-of-the-circumstances test indicates that the Statement is one of opinion. We proceed by conducting an independent assessment of the Statement utilizing the totality-of-the-circumstances analysis.

### a. Specific Language Used

{¶ 48} The assessment of the totality of the circumstances begins with an analysis of "'the common usage or meaning of the allegedly defamatory words themselves * * * to determine whether the allegedly defamatory statement has a precise meaning and thus is likely to give rise to clear factual implications.'" *Wampler v. Higgins*, 93 Ohio St.3d 111, 128, 752 N.E.2d 962 (2001), quoting *Ollman v. Evans*, 242 U.S.App.D.C. 301, 750 F.2d 970, 979-980 (1984). The Ohio Supreme Court explained:

> "A classic example of a statement with a well-defined meaning is an accusation of a crime" whereas "statements that are 'loosely definable' or 'variously interpretable' cannot in most contexts support an action for defamation." "Readers are * * * considerably less likely to infer facts from an indefinite or ambiguous statement than one with a commonly understood meaning."

(Citations omitted.) *Id.,* quoting *id.* The *Wampler* Court ultimately determined that statements like "ruthless speculator," "self-centered greed," and "exorbitant rent" are "inherently imprecise and subject to a myriad of subjective interpretations" despite their "plainly pejorative" tone. *Id.* These statements can be compared to the specific language used in *Lennon v. Cuyahoga Cty. Juvenile Court*, 8th Dist.

Cuyahoga No. 86651, 2006-Ohio-2587, where this court found the term "racist" to be unambiguous and pejorative, weighing heavily in favor of actionability. *Id.* at ¶ 30. As discussed by Husbands, the same conclusion was reached in *Niotti-Soltesz v. Piotrowski*, 2017-Ohio-711, 86 N.E.3d 1 (11th Dist.), where the specific language complained of was "you are simply a con artist." *Id.* at ¶ 22. There, the court found:

> The commonly understood meaning of "con artist," regardless of the context, is pejorative and refers to a person who deceives others by cheating, tricking, lying, etc. * * * Standing alone, this specific language is definite and unambiguous. Thus it weighs in favor of finding the statement a fact, not an opinion.

*Id.*

{¶ 49} We find that the common usage or meaning of the word "prey," implies that Husbands were victimizing older single women for their own benefit. Indeed, definitions of the verb "prey" include "to commit violence or robbery or fraud," "to have an injurious, destructive, or wasting effect," and "to victimize another or others." Like "racist" and "con artist," the term's implications are unambiguous, precise, and plainly pejorative. Therefore, the specific language used in the Statement weighs in favor of actionability.

### b. Verifiability

{¶ 50} The next totality-of-the-circumstances factor seeks "to determine whether the allegedly defamatory statements are objectively capable of proof or disproof" because "'a reader cannot rationally view an unverifiable statement as conveying actual facts.'" *Wampler* at 129 quoting *Ollman* at 981. "If the publication implies that the defendant has 'first-hand knowledge that substantiates the opinions

he asserts,' it is more likely that the statement is one of fact and not opinion." *Hersh v. Grumer*, 2021-Ohio-2582, 176 N.E.3d 1135, ¶ 72 (8th Dist.), quoting *Vail*, 72 Ohio St.3d 279 at 283, 649 N.E.2d 182.

{¶ 51} We find that the Statement is objectively capable of proof or disproof. Certainly, residents of Olympia are capable of confirming or denying whether Husbands "prey" on older members of the community and examples of Husbands allegedly predatory behavior were provided throughout the depositions of Declarant and Board President. Moreover, Declarant wrote that her letter was "documentation of [her] personal experience with [Husbands]." Therefore, we find that the Statement is verifiable, weighing in favor of actionability.

### c. General Context

{¶ 52} We now turn to the first "contextual" assessment of the totality-of-the-circumstances inquiry, which seeks to consider the "immediate context" in which the allegedly defamatory statement appears. *Wampler* at 130 quoting *Ollman* at 983. The Ohio Supreme Court explained:

> We examine more than simply the alleged defamatory statements in isolation, because the language surrounding the averred defamatory remarks may place the reasonable reader on notice that what is being read is the opinion of the writer. Put another way, * * * courts should assess "the entire article or column" because "unchallenged language surrounding the allegedly defamatory statement will influence the average reader's readiness to infer that a particular statement has factual content."

(Citations omitted.) *Id.*, citing *Scott*, 25 Ohio St.3d 243 at 252, 496 N.E.2d 699, and quoting *Ollman* at 979.

{¶ 53} Considering the Statement in the context of Declarant's entire letter, we find that the average reader would be likely to infer that the Statement was factual. Declarant wrote the letter in order to document the "ongoing aggressive activity at the Olympia Clubhouse" for Board President. The majority of the letter is dedicated to Declarant's factual recounting of the most recent clubhouse confrontation that occurred between her, Husbands, and another female resident. Declarant also provides information regarding Husbands' behavior and its effect on the Olympia community. Declarant concludes the letter by noting that it is "documentation of [her] personal experience with [Husbands]." While the adjectives used to describe Husbands' behavior are charged, a reasonable reader would likely infer that the Statement was factual based on the letter's immediate context. Therefore, this factor weighs in favor of actionability.

### d. Broad Context

{¶ 54} Lastly, we examine the allegedly defamatory statement in "'the broader social context into which the statement fits.'" *Wampler* at 131 quoting *Ollman* at 983. The *Wampler* Court stated:

> "Some *types of writing or speech by custom or convention* signal to readers or listeners that what is being read or heard is likely to be opinion, not fact." This fourth factor focuses, then, not merely on the internal context within which a particular written statement appears, but on the unmistakable influence that certain "well established *genres* of writing will have on the average reader."

(Citations omitted and emphasis sic.) *Id.*, quoting *id.* at 983-984. For example, opinion pages of the newspaper are "traditionally linked to vigorous expressions of

opinion regarding matters of public concern." *Id.* (finding that letters to the editor qualify as a "well established genre" of opinionated speech), citing *Vail,* 72 Ohio St.3d 279 at 282, 649 N.E.2d 182 and *Ollman* at 984; *Scott* at 253 (finding that the sports page was a "traditional haven for cajoling, invective, and hyperbole").

{¶ 55} In this case, the Statement was made in the Declarant's letter, which was requested from and provided to Olympia's board president in order to document ongoing incidents in the clubhouse. This is not a forum within which the average reader would expect that most statements would be statements of opinion rather than fact. Thus, this fact also weighs in favor of actionability.

{¶ 56} Because all four of the totality-of-circumstances factors indicate the Statement was one of fact, we find that the trial court erred in concluding the Statement was one of opinion. Accordingly, we proceed to the next element of defamation in order to determine whether the granting of Declarant's motion for summary judgment was appropriate on another basis.

### 2. The Second Element: Whether the Statement was defamatory

{¶ 57} A defamatory statement is either per se or per quod. When a statement "'with an apparently innocent meaning becomes defamatory through interpretation or innuendo,'" it falls into the category of defamation per quod and the plaintiff must plead and prove special damages. *Kanjuka,* 151 Ohio App.3d 183, 2002-Ohio-6803, 783 N.E.2d 920 at ¶ 16, quoting *McCartney v. Oblates of St.*

*Francis De Sales*, 80 Ohio App.3d 345, 609 N.E.2d 216 (6th Dist.1992). On the other hand, defamation per se occurs when a statement is defamatory on its face:

> Defamation per se means that the defamation "is accomplished by the very words spoken." * * * In order for a statement to be defamatory per se, it must "consist of words which import an indictable criminal offense involving moral turpitude or infamous punishment, imputes some loathsome or contagious disease which excludes one from society or tends to injure one in his trade or occupation."

*Id.*, quoting *id.* In cases of libel, this court has also held that "[a] statement is defamatory per se, if, on its face, 'it reflects upon a person's character in a manner that will cause [the person] to be ridiculed, hated, or held in contempt.'" *Sullins v. Raycom Media, Inc.*, 2013-Ohio-3530, 996 N.E.2d 553, ¶ 17 (8th Dist.), quoting *Gosden v. Louis*, 116 Ohio App.3d 195, 206-207, 687 N.E.2d 481 (9th Dist.1996). "If an alleged defamatory statement is unambiguous, whether it is defamatory per se is a question of law for the court to determine." *Id.* at ¶ 17, citing *id.* at 207, citing *Becker v. Toulmin*, 165 Ohio St. 549, 555, 138 N.E.2d 391 (1956) ("[W]here words of a publication are not uncertain and ambiguous as to their definition, it is a question for the court whether they constitute libel per se.").

{¶ 58} "'Ohio follows the innocent construction rule in adjudging defamatory statements.'" *Boulger v. Woods*, 917 F.3d 471, 483 (6th Cir.2019), quoting *Olde Vill. Jewelers, Inc. v. Outlet Comm., Inc.*, 202 F.3d 269 (6th Cir. 2000). The "innocent construction rule" provides, "If allegedly defamatory words are susceptible to two meanings, one defamatory and one innocent, the defamatory meaning should be rejected, and the innocent meaning adopted." *Yeager v. Local*

*Union 20*, 6 Ohio St.3d 369, 372, 453 N.E.2d 666 (1983); *see also Van Deusen v. Baldwin*, 99 Ohio App.3d 416, 419, 650 N.E.2d 963 (9th Dist.1994). "'It matters not that the defamatory meaning is the more obvious one. So long as the statement may reasonably be read to have an innocent meaning, the innocent construction rule commands that the statement be deemed non-defamatory.'" *Boulger* at 483, quoting *Olde Vill. Jewelers, Inc.* If a statement is reasonably susceptible to an innocent construction, the statement cannot be defamatory per se, and, likewise, if a statement is defamatory per se, the innocent construction rule cannot be applied:

> If a statement has more than one interpretation, it cannot be defamatory per se. * * * Instead, a statement that has more than one possible meaning is defamatory per quod, as it will require interpretation or innuendo to derive the defamatory meaning, or the non-innocent construction. Thus, it follows that if a statement is defamatory per se, the innocent construction rule cannot be applied, for the thrust of the innocent construction rule is that the statement has more than one interpretation.

*Murray v. Knight-Ridder, Inc.*, 7th Dist. Belmont No. 02 BE 45, 2004-Ohio-821, ¶ 31, citing *Sullivan v. Tucci*, 69 Ohio App.3d 20, 590 N.E.2d 13 (10th Dist.1990).

{¶ 59} Here, Husbands defamation per quod claim was dismissed. Therefore, in order for Husbands to overcome summary judgment, the Statement must be defamatory per se. Husbands argue that the trial court applied the incorrect standard in analyzing whether the Statement was defamatory per se. Husbands assert that the trial court's conclusion, that the Statement was not defamatory per se, was improperly based on an erroneous factual determination that Husbands had not suffered any damages or reputational harm. Husbands further argue that the

Statement does not have an innocent construction to the reasonable reader. Declarant argues that the Statement, which could have any number of meanings, can be reasonably read as having an innocent construction. Declarant asserts that this is evidenced by the significant disagreement as to the meaning of the Statement amongst the parties.

{¶ 60} We agree with Husbands and find that the trial court did not employ the proper analysis when it determined the Statement was not defamatory per se. As discussed above, the trial court should have looked to "the very words spoken" in its analysis of whether the Statement was defamatory per se; harm is contemplated by the fourth element of defamation, not the second.

{¶ 61} Based on our prior analysis of the term "prey," we also find that the Statement cannot be reasonably read to have an innocent meaning and reflects upon Husbands' character in a manner causing ridicule, hatred, or contempt. Therefore, we conclude that the Statement is defamatory per se. We continue our analysis to determine whether summary judgment can be granted in Declarant's favor on another basis.

### 3. The Third Element: Whether the Statement was published

{¶ 62} "Publication of a defamatory matter is its communication intentionally or by a negligent act to one other that the person defamed." *Hecht v. Levin*, 66 Ohio St.3d 458, 460, 613 N.E.2d 585 (1993), quoting 3 Restatement of the Law 2d, Torts (1965), Section 577(1). Publication is accomplished by any act communicating the defamatory matter to a third party; communication to only one

person is sufficient. *Id.* (finding confidential grievance complaint to a local bar association constituted a publication), citing *id.* at Comments a-b. Thus, "publication" does not require widespread dissemination for the purposes of defamation. *Id.*; *Welling v. Weinfeld*, 113 Ohio St.3d 464, 2007-Ohio-2451, 866 N.E.2d 1051, ¶ 53, ("publication" for defamation purposes is a word of art, which includes any communication by the defendant to a third person).

{¶ 63} The parties do not discuss the issue of whether publication occurred in their motions for summary judgement or appellate briefs and it is unclear whether publication is conceded in the record. Nonetheless, Declarant testified that she drafted the letter and hand delivered it to Board President. Therefore, we find that publication was accomplished when Declarant provided the letter containing the Statement to Board President, a single third party; whether Declarant's letter was shared with or provided to others beyond Board President is irrelevant to the issue of publication. We continue our analysis in order to determine whether the fourth and fifth elements allow Declarant to prevail on summary judgment.

### 4. The Fourth Element: Whether Husbands suffered injury as a result of publication

{¶ 64} "With defamation per se, damages and actual malice are presumed." *Kanjuka,* 151 Ohio App.3d 183, 2002-Ohio-6803, 783 N.E.2d 920, at ¶ 16, quoting *McCartney*, 80 Ohio App.3d 345, 609 N.E.2d 216. "However, 'the presumptions are rebuttable.'" *Shury v. Cusato*, 2022-Ohio-4401, 203 N.E.3d 175, ¶ 34 (8th Dist.), citing *Concrete Creations & Landscape Design L.L.C. v. Wilkinson*, 7th Dist. Carroll

No. 20 CA 0946, 2021-Ohio-2508, ¶ 28, and *Sayavich v. Creatore*, 7th Dist. Mahoning No. 07-MA 217, 2009-Ohio-5270, ¶ 93-94 (presumption of damages in a defamation per se claim is rebuttable); *Wilson v. Wilson*, 2d Dist. Montgomery No. 21443, 2007-Ohio-178, ¶ 14 (defendant rebutted the presumption of compensatory damages in her motion for summary judgment and plaintiff failed to meet his reciprocal burden and show a genuine issue of material fact remained for trial).

{¶ 65} Husbands argue that because the Statement was defamatory per se, damages are presumed. Husbands further argue that contrary to the trial court's findings, the Statement did damage their reputations within the Olympia community and caused them to be removed from committees. Husbands concede that they suffered no financial harm or damage to their careers. Declarant argues that "[Husbands'] reputation could not possibly be harmed by a letter only seen and read by one person." Declarant further argues that her letter was not the first or only written complaint given to Board President about Husbands and other Olympia residents were fearful of or intimidated by Husbands. Therefore, "[w]hatever their reputation at present, it is the result of their actions, and their actions alone." Declarant also claims that "[w]hatever reputation [Husbands] have at present, it is not sufficiently damaged such that [Hartman] could not marshal sufficient community support for his election to the governing body of the Olympia community."

{¶ 66} We find that the Husbands, Declarant, and the trial court all seem to agree that Husbands' reputation within the community is damaged. However, a

genuine issue of material fact remains as to the cause and extent of that damage. Therefore, we proceed to the final element of defamation to determine whether Declarant's motion for summary judgment can be granted on that basis.

### 5. The Fifth Element: Whether Declarant acted with the requisite degree of fault in publishing the Statement

{¶ 67} As established above, actual malice is presumed when a statement is defamatory per se. However, that presumption is rebuttable and "[a] person alleged to have published defamatory material may invoke the defense of qualified privilege in order to avoid liability." *Bell v. Horton*, 4th Dist. Ross No. 02CA2651, 2002-Ohio-7260, ¶ 9.

{¶ 68} A claim of a qualified privilege is an affirmative defense that must be pleaded and proved. Civ. R. 8(C). "A publication is privileged when it is 'fairly made by a person in the discharge of some public or private duty, whether legal or moral, or in the conduct of his own affairs, in matters where his interest is concerned.'" *A & B-Abell Elevator Co.*, 73 Ohio St.3d at 7, 651 N.E.2d 1283. The Ohio Supreme Court explained:

> The defense of qualified privilege is deeply rooted in public policy. It applies in a variety of situations where society's interest in compensating a person for loss of reputation is outweighed by a competing interest that demands protection. Accordingly, the privilege does not attach to the communication, but to the occasion on which it is made. It does not change the actionable quality of the publication, but heightens the required degree of fault. This affords some latitude for error, thereby promoting the free flow of information on an occasion worthy of protection.

*Id.* at 8-9.

{¶ 69} If a statement is protected by qualified privilege, the plaintiff's burden of proof for establishing the requisite degree of fault is heightened; the plaintiff must prove by clear and convincing evidence that the defendant acted with actual malice when publishing the privileged statement once qualified privilege attaches. *Kanjuka,* 151 Ohio App.3d 183, 2002-Ohio-6803, 783 N.E.2d 920, at ¶ 43; *Bell* at ¶ 10. Thus, qualified privilege "'rebuts the inference of malice that is imputed in the absence of privilege, and makes a showing of falsity and actual malice essential to the right of recovery.'" (Emphasis deleted.) *Schacht v. Ameritrust Co. N.A.*, 8th Dist. Cuyahoga No. 64782, 1994 Ohio App. LEXIS 1125 (Mar. 17, 1994), quoting *Hahn* at 244. Actual malice is defined as acting with knowledge that the statements are false or acting with reckless disregard as to their truth or falsity. *Bell* at ¶ 10, citing *Jacobs v. Frank*, 60 Ohio St.3d 111, 573 N.E.2d 609 (1991), paragraph two of the syllabus.

{¶ 70} A defendant's motion for summary judgment on the grounds of qualified privilege is adjudicated in the following manner:

> A defendant moving for summary judgment on the basis of qualified privilege must present sufficient evidence to demonstrate that no genuine issue of material fact exists as to each of the elements of the affirmative defense. * * * If the defendant can establish that there is no genuine issue of material fact on each element, then the plaintiff can only overcome qualified privilege by establishing with convincing clarity that defendant acted with actual malice. In a summary judgment motion claiming an affirmative defense, however, the nonmoving plaintiff does not have to present any evidence unless the defendant first satisfies her burden.

*McCoy v. Maxwell*, 11th Dist. Portage No. 2001-P-0132, 2002-Ohio-7157, ¶ 30, citing *Dresher v. Burt*, 75 Ohio St.3d 280, 293, 662 N.E.2d 264 (1996). Therefore, we must first assess whether Declarant presented sufficient evidence on each element of qualified privilege to demonstrate that no genuine issue of material fact exists.

{¶ 71} The essential elements to establish qualified privilege are "'good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only.'" *Hahn v. Kotten*, 43 Ohio St.2d 237, 246, 331 N.E.2d 713 (1975), quoting 33 American Jurisprudence, Libel and Slander, Section 126, at 124-125 (1941). "The issue of 'good faith' necessary to establish the privilege should not be confused with the issue of 'state of mind' necessary to defeat it." *A & B-Abell Elevator Co.* at 11. "[W]hen determining whether an occasion is privileged, courts are not concerned with a particular motive. Rather, courts are concerned with the circumstances of the communication, i.e., where and to whom the communication was made." *Bell* at ¶ 13 (finding "even if a prior dispute * * * motivated the * * * defamatory statements, the law would still protect them under the defense of qualified privilege").

{¶ 72} Moreover, the Ohio Supreme Court has held:

"'All that is necessary to entitle such communications to be regarded as privileged is, that the relation of the parties should be such as to afford reasonable ground for supposing an innocent motive for giving information, and to deprive the act of an appearance of officious intermeddling with the affairs of others. It is generally held that if the defendant publishes the defamatory words to the person interested at

the latter's request or solicitation, there is such a relationship between the parties to justify the communication.'"

*Hahn* at 246 quoting *West v. Peoples Banking & Trust Co.*, 14 Ohio App.2d 69, 236 N.E.2d 679 (4th Dist.1967), and 1 Harper and James, The Law of Torts, page 445, Section 5.26. As noted by Declarant, "A fraternal or social organization generally retains a qualified privilege in a defamation action based on its duty to report internal problems or conflicts within the organization to its members." *McPeek v. Leetonia Italian-Am. Club*, 172 Ohio App.3d 380, 2007-Ohio-7218, 882 N.E.2d 450, ¶ 10 (7th Dist.), citing *Putka v. First Catholic Slovak Union*, 75 Ohio App.3d 741, 752, 600 N.E.2d 797 (8th Dist.1991) and *Creps v. Waltz*, 5 Ohio App.3d 213, 214, 450 N.E.2d 716 (6th Dist.1982).

{¶ 73} Here, Husbands argue that Declarant failed to produce evidence that the Statement was limited in scope and made in good faith. Husbands assert that the Statement had nothing to do with Husbands' activities in the clubhouse and "reasonable minds could conclude that [Declarant] improperly used the occasion to advance her disappointment with the parties' failed friendship when she went beyond tattling on [Husbands] for opening doors, changing thermostats, and turning on lights and called them predators." Lastly, Husbands argue the issue of whether Declarant was motivated by malice presents a genuine issue of material fact and should be left for the trier of fact.

{¶ 74} Declarant argues that her letter is subject to qualified privilege because she had a duty to report internal problems or conflicts within Olympia due

to her role on Olympia's board. Declarant further argues that her letter met the guidelines for registering a complaint or issue based on Olympia's resident handbook. Moreover, Declarant asserts that Board President requested she reduce her complaint to writing in furtherance of Olympia board objectives. Finally, Declarant claims Husbands have "not even begun to make a showing by clear and convincing evidence that [Declarant] acted with actual malice, supporting this notion by conclusory statement about [Declarant's] background and intentions."

{¶ 75} Our review of the evidence reveals that Declarant was not only a resident of Olympia; she was also a member of the board. Therefore, Declarant's letter and the Statement made therein were fairly made in matters of community interest and in the discharge of Declarant's duties. Certainly, ongoing nuisance activities and confrontational behaviors of certain residents are within a community association's interest, especially when such matters create internal conflict. Moreover, Board President specifically requested Declarant provide him with a written record of the ongoing activities in the clubhouse because many complaints were made by other Olympia residents about Husbands. Declarant provided the letter to Board President in accordance with Olympia's resident handbook and did not otherwise share or distribute the letter. Therefore, we find that Declarant submitted the letter on a proper occasion and published the letter in a proper manner and to only the proper parties.

{¶ 76} However, we find that there are genuine issues of material fact regarding whether the Statement within Declarant's letter was made in good faith

and sufficiently limited to the public interest to be upheld. The Statement exceeded the scope of Board President's request for information regarding ongoing nuisance activities within the clubhouse and reasonable minds could conclude that the Statement involves a private matter rather than a public interest. Because issues of fact remain as to one element of Declarant's qualified privilege defense, we need not consider whether Husbands demonstrated actual malice by clear and convincing evidence. *See, e.g.*, *Sullins*, 2013-Ohio-3530, 996 N.E.2d 553, ¶ 32.

{¶ 77} Accordingly, we find that the trial court erred in granting Declarant's motion for summary and sustain Husbands' first assignment of error.

## III.  Conclusion

{¶ 78} After reviewing the record and evidence presented in support of each of the parties' motions for summary judgment, we conclude that genuine issues of material fact remain as to three of the five elements of defamation and neither party is entitled to summary judgment as a matter of law. While we find that the Statement was a statement of fact, defamatory per se, and published as a matter of law, reasonable minds could differ as to (1) whether the Statement was false or substantially true; (2) whether the Husbands suffered injury as a result of the Statement's publication; and (3) whether The Statement was protected by qualified privilege and Declarant acted with the requisite degree of fault.

{¶ 79} Accordingly, judgment granting Declarant's motion for summary judgment is reversed and judgment denying Husbands' motion for partial summary judgment as to the issue of liability is affirmed.

It is ordered that costs herein taxed are to be split amongst the parties.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.  Case remanded to the trial court for further proceedings.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
MARY J. BOYLE, JUDGE

EILEEN A. GALLAGHER, P.J., and
SEAN C. GALLAGHER, J., CONCUR